429 So.2d 883 (1983)
MISSISSIPPI PUBLIC SERVICE COMMISSION, et al.
v.
MISSISSIPPI POWER COMPANY.
No. 54059.
Supreme Court of Mississippi.
March 23, 1983.
Rehearing Denied April 27, 1983.
*886 Hall, Callender & Dantin, Maurice Dantin, Columbia, Bennett E. Smith, Cupit & Maxey, John L. Maxey, II, Jackson, Stanley L. Taylor, Jr., Biloxi, Martha Bergmark, Hattiesburg, for appellant.
Eaton, Cottrell, Galloway & Lang, James S. Eaton, Ben H. Stone, Gulfport, Watkins & Eager, Hassell H. Whitworth, Jackson, for appellee.
En banc.
BROOM, Presiding Justice, for the Court:[1]
Electric power rate increases pursuant to Mississippi Code Annotated งง 77-3-37, -39 (1972) were sought by Mississippi Power Company (MPC) before the Public Service Commission (PSC) which, by order dated April 16, 1981, in part denied the increases. MPC had filed a refunding bond pursuant to ง 77-3-39, supra, thereby placing the rates in effect. MPC appealed to the Chancery Court of the First Judicial District of Hinds County, the Honorable Joe Moss, Chancellor. From the March 19, 1982, chancellor's decree largely favorable to MPC, direct appeal to this Court was taken by PSC, and cross-appeal was taken by MPC. Pertinent facts will be stated in this opinion as appropriate to the issues argued.
MPC, in seeking the proposed rate increase, contended that its total rate base to be utilized in determining the net operating income requirements was approximately $554,000,000. Included in MPC's calculation of the rate base was over $40,000,000 attributable to contract adjustments between MPC and Gulf Power Company with respect to the acquisition of 1/2 interest by each Company in the Jackson County steam generation plant (Plant Daniel), and for the purchase of certain railroad cars to be used in transporting coal to Plant Daniel.
PSC determined that, of this approximately $40,000,000 which MPC had included in the rate base, $19,000,000 associated with Plant Daniel adjustment payments to Gulf Power Company, and over $1,000,000 associated with coal car payments to Gulf Power Company, were not to be included in MPC's rate base because the transaction between MPC and Gulf Power had resulted in no additional electric generating capacity for the benefit of MPC's customers.

PART I
DAN M. LEE, Justice, for the majority:

THE PLANT DANIEL TRANSACTION
Mississippi Code Annotated section 77-3-39 (1972) authorizes the PSC to establish rates that are just and reasonable to the taxpayers and which will yield a fair rate of return to the utility for its services. Because public utilities are monopolies engaged in the business of furnishing necessary services to the public, the PSC is, in effect, the counterpart of the marketplace by which other businesses are measured. The intent of the legislature in creating the PSC was an effort to impose an authoritative body between the ratepayers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served.
The PSC's rate-making decisions are never final due to the fluctuation of prices, inflation, business movement and other factors affecting their operations. Such variables necessitate applications for rate adjustments by the utilities for their very existence which necessarily impinge upon the pocketbooks of the utilities' ratepayers. To preserve a balance of the equities and lend stability to this ever present factor between investors and consumers, the legislature has established a standard of just return to the utility and reasonable rates to the consumer. Accord State of Mississippi, et al v. Mississippi Public Service Comm'n., No. 53,709, decided March 9, 1983, not yet reported.
*887 In Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Comm'n., 237 Miss. 157, 113 So.2d 622 (1959), this well-established principle was construed:
The reasonableness or unreasonableness of the rates charged, or to be charged, by a public utility for its service or produce is not to be determined by any definite rule or legal formula, and is not measurable with any great degree of exactness, but is a question of fact calling for the exercise of sound discretion, good sense, and a fair, enlightened, and independent judgment. In determining whether a rate is reasonable, each case must rest on its special facts. 73 C.J.S., 1032, Public Utilities, par. 25 a, and cases cited.
* * * * * *
What appellant in this case is entitled to is "just and reasonable" rates which will yield "a fair rate of return" to the appellant upon the reasonable value of the property used or useful in furnishing service. A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility. From the standpoint of the Company it is important that there be enough revenue not only for operating expenses but also for the capital cost of the business, which includes service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments and other enterprises having corresponding risks and sufficient to assure confidence in the financial integrity of the business. What the public is entitled to demand is that no more be exacted from the rate payers than the services are reasonably worth. (237 Miss. at 238, 241, 113 So.2d at 654, 656) (emphasis ours).
The legal principles relating to the PSC's authority in establishing rates are well settled and have not been subject to any substantial change. They are:
1. The burden of proof rests on the public utility to establish the reasonableness of new rates. Southern Bell T. & T. Co. v. Mississippi Pub. Serv. Com'n., 237 Miss. 157, 113 So.2d 622 (1959).
2. The commission, with its expertise, is the trier of facts and within this province it has the right to determine the weight of the evidence, the reliability of estimates and the credibility of witnesses. Capital Electric Power Ass'n v. Mississippi Power & Light Co., 216 So.2d 428 (Miss. 1968); and Southern Bell T. & T. Co. v. Mississippi Pub. Serv. Com'n., 237 Miss. 157, 113 So.2d 622 (1959).
3. The order of the commission is presumptively valid. Loden v. Mississippi Pub. Serv. Com'n., 279 So.2d 636 (Miss. 1973).
4. The reasonableness of rates charged, or to be charged, by a public utility is not determined by definite rule or legal formula, but is a fact question requiring the exercise of sound discretion and independent judgment in each case. Southern Bell T. & T. Co. v. Mississippi Pub. Serv. Com'n, 237 Miss. 157, 113 So.2d 622 (1959).
5a. The chancery court's authority on review is limited by Mississippi Code Annotated section 77-3-67(4) (1972) to: The order shall not be set aside in whole or part except for errors of law, unless the court finds it is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of statutory authority or violates constitutional rights.
5b. The authority of 5a has been construed at times as follows: The sole question presented for decision is whether or not the action of the commission was arbitrary, not supported by substantial evidence, or was manifestly against the evidence. Tri-State Transit Co. of La. v. Dixie Greyhound Lines, 197 Miss. 37, 19 So.2d 441 (1944).[2]
With these principles in mind, we turn to the facts presented in the instant case.
MPC is a corporate public utility as defined in the Public Utility Act of 1956 as amended. It is incorporated under the laws *888 of the State of Mississippi. All of MPC's common stock is owned by the Southern Company, an investor-owned public utility company, organized and existing by and through the laws of the State of Delaware. The Southern Company also owns the common stock of Georgia Power Company, Alabama Power Company and Gulf Power Company. These four operating companies of the Southern Company system are interconnected by a transmission grid and the generating facilities of the operating companies are operated as a fully integrated power system, which MPC contends has many advantages.
MPC is engaged in the generation, transmission, distribution and sale of electric energy to the public in 23 counties in southeast Mississippi. It serves 52 municipalities and 70 nonincorporated communities. MPC serves at wholesale all of the requirements above that are supplied by the Southern Company system, including one REA distributing cooperative and part of the requirements of two other such rural electric cooperatives.
In Mississippi Power Co. v. Mississippi Public Service Comm'n., 291 So.2d 541 (Miss. 1974), we said:
The Court also cited with approval Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and quoted from it as follows:
"The rate-making process under the Act, i.e., the fixing of `just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case [Federal Power Commission v. Natural Gas Pipeline Co.] that `regulation does not insure that the business shall produce net revenues.' 315 U.S. 575 p. 590, 62 S.Ct. 736 [745], 86 L.Ed. 1037... . (291 So.2d at 556) (emphasis ours).
On October 20, 1980, MPC filed with the PSC a notice of change in rates to become effective on November 20, 1980. The proposed rate increase was designed to produce $39,306,000 additional revenue. On November 10, 1980, MPC filed a refunding bond as provided by law, said bond was approved by the order of the commission, and the rates were placed into effect subject to refund on November 20, 1980. After hearings were held from time to time, they were finally concluded on April 16, 1981, and consisted of 16 volumes encompassing 2470 pages. The PSC made an extensive 30-page finding of facts and order that granted MPC a rate increase of $10,877,000 even though it had allowed a rate increase to MPC on March 7, 1980, in the approximate amount of $17,000,000. In so doing, the PSC made some nine adjustments to the company's rate base, two adjustments to the company's estimated expenses shown on the operating statement and allowed a rate of return of 9.76%.
MPC appealed to the chancery court and the learned chancellor reversed the PSC as to the disallowance of $19,000,000 attributed to the Plant Daniel transaction, holding that nowhere in the findings did the commission set forth any explanation as to how it arrived at the $19,000,000 figure except that this was one-half of the $38,000,000 increase as shown by MPC. The learned chancellor found that the commission's order reducing by one-half the $38,000,000 figure was an abuse of discretion by the commission and was not supported by the evidence. Portions of the 30-page order and findings of fact with reference to Plant Daniel are as follows:
The four operating companies of The Southern Company System are interconnected by a transmission grid and the generating facilities of the operating companies are operated as a fully integrated power system. The Company contends that this has many advantages.

Although this integrated system of ownership and operation of generating facilities is not a direct issue in this case, it is a matter of continuing and growing importance to this Commission as it bears directly on the Company's rate base and capital costs which must be supported by Mississippi customers. In this connection, the Commission takes note of the fact *889 that the Jackson County Steam Plant unit no. 2 (hereinafter referred to as Plant Daniel unit no. 2) is scheduled for commercial production in 1981 and that its addition to the System contributes significantly to the Company's rate increase request in this case.
Pursuant to the Commission's Order of August 27, 1976 in Docket U-3168, the Company sold a one-half undivided interest as tenant in common in its Plant Daniel to Gulf Power, an affiliated member of The Southern Company System. This transaction was proposed due to the Company's earlier overestimate of its own generation capacity requirements and Gulf's apparent need for more capacity at a time when Plant Daniel was under construction. The Commission approved the proposed sale based on the Company's representation that it would be in the best economic interest of both the Company and its customers and that it would thus serve the public interest.
The Commission's Order in Docket U-3168 stated that after Plant Daniel unit no. 2 was completed, necessary adjustments would be made so that each party would have a 50% ownership interest in both units and the common facilities, but appropriate rate treatment with respect to the sale was not specified at that time.
In this case the Company's proposed ratemaking treatment with respect to the completion of Plant Daniel unit no. 2 reflects an exchange of ownership between the Company and Gulf Power pursuant to the Commission's approval in 1976 under which the Company will relinquish a half interest in Plant Daniel unit no. 1 for a half interest in unit no. 2. Since unit no. 1 was completed about four years earlier than unit no. 2, unit no. 2 is more costly and the exchange results in a substantial increase in the Company's proposed rate base without any addition of capacity.

While the Company projected in 1977 that the cost of this exchange with Gulf Power would ultimately amount to $16 million, the amount actually proposed as a gross plant addition in this case is $38 million. The staff witnesses who addressed this matter recommended that the cost-over-run should be considered in arriving at the allowed rate of return in this case. In addition, the staff witnesses recommended that the Plant Daniel unit no. 2 coal stocks should be excluded from the Company's rate base in this case, and that increased rail car costs should also be excluded. On May 13, 1977 in an Order in Docket U-3245, this Commission permitted the Company to purchase 230 coal cars at a cost of $35,000 each to serve Plant Daniel. The Company's proposed rate treatment here is to, in effect, exchange half of those cars with Gulf for corresponding cars costing $44,900 each, thus producing a rate base addition of $1,138,500. The Company's rate base shall be reduced accordingly.
This Commission must, at this time, give careful consideration to this subject and its effect on the overall cost of energy to the Company's customers.
Further, the Commission takes notice of the evidence introduced by the Company regarding its generation plant investment and operating costs. For many years now the Commission has continuously monitored revenue and audited the Company's fuel costs for generation of electricity. Monthly, quarterly, and annual reports are received from the Company and independent auditors employed by the Commission. The growing concern over rising generation costs require that this Commission carefully study, investigate and give careful consideration in appropriate hearings to all plans and efforts by the Company which contribute to these costs so that the Commission is able to assure that the resulting effect will be the lowest, ultimate cost of electric energy to Mississippi customers, both now and in the future. In this regard, the Commission takes note of the fact that the Company's last rate increase was effective October 10, 1979, pursuant to this Commission's Order of March 7, 1980 in Docket No. U-3739 and was projected to yield increased revenues of $16,805,000 *890 annually. The filing of this case within a matter of months after that Order seeking an additional $39.3 million in annual rate increases is virtually unprecedented in this jurisdiction and serves to clearly illustrate the urgent need for particularly careful regulatory scrutiny of the Company's alleged revenue deficiency in this case.

The result of this Order, as hereinafter set out, is to find and order that the proposed new schedule of rates and charges filed by the Company on October 20, 1980, are unjust, unreasonable, and unlawful and shall not be allowed or approved. The proposed new rates result in an increase in revenues to the Company which is excessive and further result in an unfair and unjust burden on the Company's customers. Consistent with this result, however, the Commission is compelled to acknowledge certain current economic realities which must be considered in reaching a decision in this cause which will be supported by substantial evidence.
To ignore the evidence regarding the impact of inflation and general economic conditions on the Company's cost of providing electric service to its customers would constitute an error of law and disregard for the express terms of the Act. However much this Commission may be aware of the burden and hardship placed on the public by any increase in the cost of electric service, it cannot avoid the responsibilities placed on it by the Act and render decisions which will be upheld as consistent therewith. To do otherwise could result in consequences having greater adverse effects on the public.
The Company failed to meet the burden of proof necessary to justify the increase in revenues produced by the proposed new schedule of rates and charges; however, there remains sufficient evidence, which a court would recognize, to support the additional revenues which the Company is allowed an opportunity to earn as a result of this Order.
* * * * * *
One additional adjustment that the Commission feels is required is to eliminate the rate base effect of the excess cost of Plant Daniel unit no. 2. It is unthinkable to ask the Mississippi ratepayers to shoulder this additional burden. It seems obvious that any such cost increases should be borne by the ratepayers of Gulf Power Company. Although it is true that this Commission relied on the Company's projections and estimates and allowed the Company to sell a one-half undivided interest in the Daniel Plant to Gulf Power Company, there was never a determination made that the proposed sale would impact Mississippi ratepayers to the extent that the Company now proposes. The Company's plant accounts will increase by an estimated $38,000,000 when Plant Daniel unit no. 2 goes into commercial operation (currently estimated at May 31, 1981). The Company has not demonstrated to the satisfaction of this Commission that the ownership of a one-half undivided interest in both Plant Daniel units as opposed to the present ownership of only unit No. 1 will be any more beneficial to Mississippi ratepayers. The Company's proposal is unsupported in the record and not in the best interest of Mississippi ratepayers... .
The PSC with its expertise is the trier of facts and within such province has the right to determine weight of evidence, reliability of estimates and credibility of witnesses, in passing on new rates. Mississippi Public Service Comm'n. v. Mississippi Power Co., 337 So.2d 936 (Miss. 1976); Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Comm'n., 237 Miss. 157, 113 So.2d 622 (1959).
The standard of review of an appeal from the PSC's order is proscribed in Mississippi Code Annotated section 77-3-67(4) (Supp. 1982) which provides as follows:
(4) The court may hear and dispose of the appeal in term time or vacation and the court may sustain or dismiss the appeal, modify or vacate the order complained of in whole or in part, as the case may be. In case the order is wholly or *891 partly vacated the court may also, in its discretion, remand the matter to the commission for such further proceedings, not inconsistent with the court's order as, in the opinion of the court, justice may require. The order shall not be vacated or set aside either in whole or in part, except for errors of law, unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights.
On appeal, such findings are presumptively valid and an appellate court cannot substitute its judgment for that of the commission provided substantial evidence exists to support its findings or its findings are not manifestly against the weight of the evidence. Mississippi Public Service Comm'n. v. Mississippi Valley Gas Co., 327 So.2d 296 (Miss. 1976); Loden v. Mississippi Public Service Comm'n., 279 So.2d 636 (Miss. 1973); Citizens of Stringer v. G.M. & O.R.R., 229 Miss. 1, 90 So.2d 25 (1956); and Cobb Bros. Constr. Co. v. Gulf, M. & O.R. Co., 213 Miss. 706, 57 So.2d 570 (1952).
The finding of the commission is supported in the record by the testimony of Dr. J.W. Wilson, staff witness of the Public Service Commission, a part of which is as follows:
Q. Were the financial details of the proposed transaction specified and approved in the commission's 1976 order?
A. No; the Order simply stated that after Unit 2 was completed "the necessary adjustments" would be made so that each party would have a 50% ownership interest in both units and the common facilities. No financial details as to "the necessary adjustments" were specified. It is clear however that the Commission did contemplate that the transaction, as ultimately consummated, would be economically beneficial to all concerned and would thus serve the public interest.
Q. Are the specific financial details, as proposed by MPCo for ratemaking treatment in this case, consistent with the commission's 1976 determination that the transaction be in the best economic interest of both the company and its customers?
A. That is questionable. The end result of the Company's proposed ratemaking treatment here is to substantially increase the financial burden of Mississippi consumers without giving them one more kilowatt of electricity. This result occurs because upon completion of Unit 2 at the Jackson County Steam Plant (which has been owned and financed by Gulf pursuant to the Commission's approval in 1976) MPCo will, in effect, trade Gulf a half interest in its own Unit 1 for a half interest in Unit 2. Of course, since Unit 1 was completed about four years earlier than Unit 2, Unit 2 is more costly and thus the trade results in a substantial increase in the cost of MPCo's rate base without any addition of capacity.
Q. Is the excess cost of Unit 2 over Unit 1 more than was contemplated at the time the commission approved the transaction?
A. Yes. While the Company reported in 1977 that the cost to MPCo would ultimately amount to $16 million, the amount actually proposed as a rate base addition in this case is $38 million. While the Commission may determine that an appropriate rate base adjustment is warranted in this regard, I believe that, at a minimum, this cost-overrun should be considered in arriving at the allowed rate of return in this case, and that such consideration warrants a return allowance at the bottom of the applicable range.
In retrospect, the arrangement proposed with respect to Unit 2 of the Jackson County plant, appears to be a far better deal for others in The Southern Company than for MPCo. It's as if I had purchased two adjacent lots some time ago, expecting to construct a very large home; then decided to build a smaller one; sold the extra lot to a relative who, several years later, built an identical home and upon its completion pooled his interests *892 with mine so as to share equally the costs of the two undertakings. If my home cost $40,000 and was financed at 8% but his identical home, built several years later, cost $60,000 and was financed at 12%, the redivision of costs on an equal basis leaves me worse off financially than I was before. Presuming that we had agreed in advance to pool our interests upon the completion of his home and subsequently to make "the necessary adjustments" in "the best economic interest" of us both, it would seem that my fair share of the joint costs should be less than half. This is particularly so if I originally sold the extra lot at my original cost even though building site costs had escalated since its original acquisition and if I had done all the work in obtaining building permits and zoning ordinances. Moreover, to share my original cost of common facilities such as the water main and access road, equally and without markup, would be a further gratuity to my relative, as would a charge equal to the original cost of certain necessary landscaping improvements on the second lot even though landscaping costs had subsequently skyrocketed. Clearly then, at the time we pool our assets, "the necessary adjustments" to serve our mutual "best economic interest" should not be a 50/50 total cost split. Yet this is essentially the ratemaking arrangement which MPCo proposes in this case as a result of the Jackson County transaction with Gulf Power, its sister company even though the Unit 2 cost excess is more than double the amount that had been anticipated.

"Q. Are there certain aspects of the Jackson County Unit 2 arrangement where cost disallowances are clearly called for?
A. Yes. As my associate, Mr. Clark, has pointed out, the cost of Unit 2 coal stocks should be excluded from MPCo's rate base in this case. In addition, increased rail car costs should also be excluded. On May 13, 1977 in its order in Docket U-3245, this Commission permitted MPCo to purchase 230 coal cars at a cost of $35,000 each to serve the Jackson County Plant. Now the Company proposes, in effect, to exchange half of those cars with Gulf for corresponding cars costing $44,900 each. This unwarranted rate base addition of $1,138,500 should be disallowed. The computation of this disallowance is shown in Exhibit ____ (J.W. 15)."
On review of the record consisting of the testimony of many experts for both the PSC and MPC and the detailed finding of facts made in the commission's order, we find that the chancery court erred in reversing the PSC's order which reduced MPC's proposed inclusion of $19,000,000 plus $1,138,500 in the overall rate base as to the Plant Daniel transaction. In view of the foregoing, the chancery court decree reversing the PSC's order as to the Plant Daniel transaction is reversed.

PART II
BROOM, Presiding Justice, for the Court:
Next argument of PSC is that the lower court:
[E]rred in finding that it was error for the Commission to ignore the actual maintenance expense as shown by the Company for 1980, and to base its finding on the testimony of Dr. Wilson based upon the 1976 to 1979 trend.
In MPC's projections for the 1981 "test year"[3], MPC projected $23,256,000 maintenance expense in its pro forma figures. Maintenance expense figures are a vital determination in any rate-making procedure because it is one of the accounts which is subtracted from gross revenues in order to obtain net operating income figures. When a utility establishes through evidence and testimony a requirement for a certain amount of net operating income, maintenance expense is one element which must be computed into the net operating income figure in order to determine the utility's gross revenue requirements (and hence the rates its customers will be charged).
*893 PSC's order disallowed $3,177,000 of MPC's projected maintenance expense figures, reducing the amount from $23,256,000 to approximately $20,079,000. PSC found that (1) MPC's projected figures for 1981 maintenance expenses included some "nonannual" elements which PSC held were not properly includable in the test year figures; (2) PSC found that the test year figures should reflect "normalized" projections for maintenance expenses; (3) PSC found no evidence of adequate attention by MPC to labor productivity improvements; (4) PSC held that the proper calculation of maintenance expenses in a projected test year utilized for rate-making purposes was the "historically trended figures" calculation procedure used by the PSC staff in conjunction with recognition of inflationary impact upon such historical trends.
MPC appealed on this point to the chancery court which decreed that PSC's disallowance of $3,177,000 from MPC's test year maintenance projections was error. The chancellor noted that the basis of the staff witness's maintenance expense projection procedure was a historical "track" record of MPC's past maintenance expenses. Also, the chancellor noted that the staff witness admitted that the years which had been utilized in arriving at PSC's recommendations were 1976 through 1979. The chancellor held that the staff witness's failure to utilize actual maintenance expenses for 1980, which had been available to the staff witness, invalidated the witness's projection. Therefore, the chancellor reinstated MPC's original 1981 test-year maintenance expense projection figure of $23,256,000 and PSC appeals therefrom.
MPC witnesses testified in support of its maintenance expense projections. They testified that the pro forma year projection did represent a 36% increase over the 1979 maintenance expense projection but observed that this 36% increase was over a 2-year period (which in actuality represented an 18% growth rate per year). In years past this percentage of an increase in year-to-year maintenance expenses was not unusual. In 1978 the increase in maintenance expense was at a rate of 18%. MPC's witnesses also testified as to the distinction between "normal" maintenance and "annual" maintenance, and indicated that a great deal of "heavy" maintenance occurred on a regular basis, but not upon an annual basis. Therefore, they testified that such factors must be included in any maintenance expense projections.
PSC staff witnesses disagreed with the maintenance expenses proposed by MPC, and introduced testimony and exhibits which they relied on in adjusting MPC's proposed maintenance expense projection downward by $3,177,000. They testified that the adjustment to MPC's requirements projections was based upon a level of expenses and the growth of those expenses for years prior to 1979, but admitted on cross-examination that the figures used in arriving at the $3,177,000 adjustment did not include the actual 1980 maintenance expense figures.
It is important to note that in spite of the fact that the staff's own methodology has its basis in actual, historical maintenance expense figures, they did not employ the actual figures for the most recent year in arriving at the recommended adjustments to MPC's maintenance expense projections.
In rebuttal to staff witnesses' testimony, MPC's witness testified that it was improper and irresponsible to base maintenance expense projection exclusively upon the use of a mathematical formula without consideration for MPC's actual budgeting and expense forecasting procedures. He likewise testified as to the inaccuracy of the results of staff witnesses' "historically trended figures", when such method left out the actual figures for the most recent historical year. Using the staff's own technique for forecasting maintenance expense, the inclusion of the actual expense figures for 1980 results in a projection which is higher than the amount MPC actually requested.
We find that, based purely upon the testimony presented on the question of MPC's proposed maintenance expenses the PSC was in error. The selection of the appropriate method for accurately projecting *894 maintenance figures is generally within PSC's sound discretion. See State of Mississippi, et al. v. Mississippi Public Service Commission, supra. However, it was clearly error and arbitrary for PSC to base its adjustment to the Company's maintenance expense projection upon the utilization of a methodology which, according to its own admission, did not use the actual figures for the most recent year. We reverse the chancellor's reinstatement of MPC's original request and, on remand, the historically trended analysis shall employ the most current data available.
PSC's next assignment of error is:
The Chancery Court erred in disallowing the Commission's reduction of the Company's requested cash working capital from $25,714,000 to $523,000, a reduction of $25,191,000.
A reasonably succinct definition of "working capital" was given by MPC witness Mr. H.A. Gower (partner in the independent accounting firm of Arthur Andersen):
A. "Working capital" as it is or should be used in utility rate making means the economic input of capital, in excess of the amount used to finance net utility plant, which is necessary to cover the lag from the time when costs of service are incurred until the time payment is received through rates charged to customers... .
Q. Is your definition of utility working capital the same as cash working capital?
A. No, it is not. It is true that on occasion the working capital allowance is referred to as cash working capital. However, this limited concept fails to consider that an investment is required in capital cost items which may not contemporaneously result in cash transactions.
Since cash working capital, as well as other working capital, constitutes a portion of investor-contributed capital, it is properly included in the rate base for the purpose of determining the return on investor capital. Therefore, it follows that any reduction in the cash working capital allowance results in a corresponding reduction in a utility's rate base which in turn reduces the gross revenue and ultimately the investors' return on capital.
In submitting proposed figures to PSC as a part of the instant rate proceeding, MPC proposed an allowance of $25,714,000 as the cash working capital component of the rate base. This figure was based upon the "45-day formula" which had been previously employed by MPC in determining the cash working capital component in all previous rate-making proceedings.[4]
In its findings and order, PSC found that:
Investors are entitled to earn a return not only on the fixed plant and property of the utility, but also on reasonable working capital which is investor-supplied funds needed by the utility to meet its day-to-day operating expenses. A utility must pay for certain expenses in its operations prior to recovering the full amount necessary to pay that expense in revenues from its customers.
After providing the definition of the basic rationale for the allowance of a cash working capital component in the rate base, PSC went on to describe how such a component was to be ascertained:
The amount of cash working capital needed for such expenses is determined by conducting a lead/lag study which computes the time intervals between: (1) the time that service is provided by the company and the time the company received payment for that service and, (2) the period for which various expenses are incurred by the company and the date that those expenses must be paid. These two intervals, the former of which is the payment lag and the latter of which is the expense lag are combined to reach a net interval. This interval is then multiplied *895 by the company's average daily expenses to determine the necessary working capital.
PSC found that MPC had based its cash working capital calculations upon the 45-day formula and that such an approach to the determination of the cash working capital component of the rate base was inappropriate. Further, PSC held that this determination had been reached on the basis of the staff witnesses' testimony.
After arriving at the above described conclusions, PSC made an extraordinarily curious finding of fact:
The Commission further finds that the staff's proposed lead/lag approach will produce a just and reasonable result for this Company in this case.[5]
PSC found that MPC's use of the 45-day formula was based upon two erroneous assumptions: (1) that not all operations and maintenance expenses are paid on the exact date that service is rendered, and (2) not all customers pay utility bills exactly 45 days after service is rendered. PSC held that in view of these erroneous assumptions included in the traditional 45-day rule approach, a "lead/lag" study was the proper method for determining the cash working capital component of a rate base. In addition to the above described holdings, PSC's order also concurred with the staff's recommendation of taking into account the lag time in payment of deferred interest expense and deferred preferred stock dividends in offsetting the amount of cash working capital.
MPC appealed PSC's 98% reduction in their proposed cash working capital requirements. In reversing PSC's disallowance of 98% of MPC's request, the chancellor held that PSC's reduction had been based solely on the testimony of Mr. Albert Clark. The chancellor, noting that Clark did not do a "lead/lag" study[6] of MPC's cash working capital requirements, held that since the actual figures supplied by Clark were based upon his prior experience in doing other lead/lag studies, it was incumbent upon Clark to provide (which Clark failed to produce) copies of those studies to MPC in order to substantiate his guesstimates. Further, the court held that since Clark had testified that a lead/lag study was the only authoritative method for determining the cash working capital component of a rate base, PSC improperly admitted Clark's testimony of a "phantom" lead/lag study. The chancellor very judiciously dealt with this issue and relied upon Mississippi Public Service Commission v. Mississippi Power Company, 366 So.2d 656 (Miss. 1979). In discussing the problem, the chancellor stated:
In the case of Miss. Public Service Comm. vs. Miss. Power Co., 366 So.2d 656, the Court said:
"Dr. Bicksler used printouts from the Center for Research for Security Prices, based in Chicago. These are referred to as `CRISPE tapes' and received treatment by us in Mississippi Valley Gas, 1978, supra. Dr. Bicksler testified in that case, using CRISPE tapes. There, the company had moved for an order to direct Dr. Bicksler to `furnish the written material, documents, letters and data fed to the computer, and the questions asked and tasks assigned, to the computer, for the purpose of cross-examining Dr. Bicksler about the CRISPE tapes.' Later renewed, the motion was denied by the Commission. This Court there said as the chancellor had said, `Dr. Bicksler might have reached the right result, but in the present state of the record there is no way to tell.' Since Dr. Bicksler's testimony was largely based upon the unauthenticated tapes about which he testified, but did not produce, *896 the chancellor here correctly held that the Commission could not properly rely upon his testimony in this important matter, even though he gave other testimony unrelated to the tapes."
Inasmuch as the witness Clark testified (over objection) that he estimated the lags based on his experience and participating in preparation of lead/lag studies for other similar utilities followed by his statement that he had not given the Company this information, it was error for the Commission to admit the testimony or to rely upon it. His study was properly titled by the Company witness Grower as a "phantom" study.
MPC witnesses testified that the cash component of MPC's proposed rate base was determined by applying the fraction of 45/360ths (1/8th) of MPC's total annual operational and maintenance expenses. This fraction is determined on the basis of the assumption that there is an average time lag of 45 days (out of 360) between the time service is rendered to a customer and the time payment is received for such service. They further testified that this fraction was consistent with all prior MPC filings with PSC.
PSC's staff witnesses testified that the only proper way for determining a utility's cash working capital requirements was through the conducting of a detailed "lead/lag" study to determine the actual amount of lag time the utility was experiencing between the rendition of service and the actual receipt of revenues associated with such rendition of service, and recommended the use of a 25-day lag period for determining cash working capital. The staff witness testified that this recommendation was based upon "my participation in and awareness of lead/lag analyses prepared by associates and myself and several prepared by investor-owned electric utilities." Mr. Clark then testified that the prior lead/lag analyses were performed on utilities other than MPC.
With this admission, the staff witness discredited his entire subsequent testimony. A close reading of his description of the virtues of a lead/lag analysis approach to the determination of cash working capital reveals that the principal virtue of a lead/lag analysis is that it provides a precise determination of the working capital required for an individual company. By basing his lag-time figures upon other companies, the witness effectively destroyed the entire basis for doing a lead/lag analysis at all.
In rebuttal, MPC offered testimony that a lead/lag study was a complicated and expensive proposition and that the formula method was comparatively advantageous in that it was simple, easily applicable, and produced a generally accurate result. An expert for MPC testified that Mr. Clark's working capital recommendation had been based upon a "phantom study". He further testified that Mr. Clark had presumed various leads and lags based upon his experience with other companies, whereas a true lead/lag study by definition only had application to the specific company upon which it was performed.
Based solely upon the evidence adduced at the hearing before PSC, we find that the PSC's reduction in MPC's requested cash working capital requirements was error. There is no question that PSC has the authority to determine the method by which such cash working capital requirements shall be calculated. If PSC, in its expert opinion, feels that a lead/lag analysis should be performed in order to properly ascertain cash working capital requirements, such a requirement should be included as a part of its rules and regulations. In the instant case, not only does PSC's change from previous methods of determining the cash working capital requirement without notice to MPC constitute an arbitrary and capricious decision, the actual figures adopted by the Commission are not even derived from the lead/lag analysis which it so highly touts.
Upon remand, because of the peculiar nature of this feature of the cause (PSC's 98% reduction of cash working capital), further testimony on this issue may be presented by PSC's staff witnesses and by MPC, in *897 which event such testimony shall be considered by PSC in making its decision as to cash working capital. Mississippi Public Service Commission v. Mississippi Power Co., 366 So.2d 656 (Miss. 1979); Mississippi Code Annotated ง 77-3-67(4) (Supp. 1982).
PSC's next assignment of error is:
The chancery court erred in finding that it was error for the Commission (PSC) to eliminate from rate base the cost of construction work in progress (CWIP) with respect to the plant items which are not and will not be revenue producing.
MPC included in its balance sheet accounts the total of all work orders for construction work in progress (CWIP) and divided it into two components:

 Revenue producing - $9,550,000
 Non-revenue producing - $8,804,000

The first of these represented those facilities being built to meet the increased needs of existing customers and was referred to as revenue producing. Allowance for funds used during construction (AFUDC) was computed on the amount allocated to component 1, but not to that allocated to component 2. This latter component was said to represent those projects which were non-revenue producing or non-expense reducing. An amount of $1,384,000 was said to be the total allowance for funds used during construction (AFUDC) of the revenue producing facilities and was treated as part of power company's operating income since it had use and control of the funds.[7]
PSC disallowed any CWIP being included in the rate base and eliminated AFUDC from operating income with the following language:
The primary reason CWIP should not be included in the company's rate base is that such investment is not used and useful in the rendition of electric service to rate payers. Especially where, as here, a projected test period is used, it is inappropriate to further reach beyond the end of the projected test year to include CWIP in the rate base.
PSC determined that the method proposed by MPC which would include CWIP in the rate base, while relegating AFUDC to operating income, was not a "special fact" which might merit inclusion. It also found that it was not the general practice of this jurisdiction to include CWIP in the rate base.
MPC showed a total of $18,354,000 in expenditures for CWIP during the test year. It conceded that part of this should be capitalized, but that part should be included in the current rate base in question. This was because part of the CWIP would be revenue producing and earn a return once put into service. This category of CWIP constituted component 1. However, part of the CWIP expenditure was non-revenue producing. Once it was capitalized, it would be part of the rate base, but it would not be part of the rate base currently being considered for proposed rate increase. This would mean an $8,804,000 expenditure without an immediate means of gaining a return other than depreciation. MPC did not show any data which would "break-down" of what the non-revenue producing CWIP actually consisted.
The chancellor found error in PSC's denial of the inclusion of CWIP in the rate base as it applied to the non-revenue producing component. He found that MPC had not requested a rate increase based upon revenue producing items.
We hold that the chancellor's decision was error. We have previously held that the PSC could quite reasonably exclude CWIP for a utility's test year rate base since such construction, upon completion and being placed in service, was then capitalized and includable in the rate base. See State of Mississippi, et al. v. Mississippi Public Service Commission, supra; United Gas Corporation v. Mississippi Public Service Commission, 240 Miss. 405, 127 So.2d *898 404 (1961); Southern Bell Telephone and Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 113 So.2d 622, 653 (1959). MPC failed to define "non-revenue producing" CWIP (other than by vague examples) and likewise failed to offer a compelling justification for distinguishing "non-revenue producing" CWIP from "revenue producing" CWIP. Therefore, the chancellor erred in overruling the PSC's decision to deny all CWIP from MPC's rate base. See Southern Bell, supra, at 238, 113 So.2d at 647.
PSC's next assignment of error is:
The Chancery Court erred in finding that the amortization of benefits of the accumulated deferred income taxes should be made over the useful life of the property giving rise to the funds contrary to the determination of the Commission.
The question is whether a portion of the federal tax reserve maintained by MPC should be repaid to rate payers on an accelerated basis or held in reserve by MPC and returned over a time period congruent with the useful life of the property which gave rise to the funds initially.
When property is depreciated on an accelerated basis, MPC credits the tax benefit received to a special account in order to insure its ability to pay taxes over the property's total useful life after the full value has been depreciated. This special account is kept when deferred income taxes are included as an expense item in the overall rate base of a utility and is referred to as "comprehensive inter-period tax allocation accounting."[8] Meanwhile, MPC has use of the funds kept in reserve for this purpose.
In 1978 the tax law was changed effective in 1979. The 48% rate on corporate income over $100,000 per year was lowered to 46%, resulting in an unexpected windfall to MPC. The deferred tax account had been "over-funded." All parties involved in this matter agree that the fund's surplus should inure to the benefit of the rate payers, but disagree on how it should be done.
PSC's primary witness on this matter, Dr. Wilson, recommended that the surplus in the deferred tax account be amortized and returned to the rate payers over a period not to exceed two years.[9] He estimated the current amount of the surplus to be $1,984,000 and that amortization over two years would result in a refund of $3,827,000 in his best judgment. He noted that the immediate removal of the current surplus amount from the rate base would result in both state and federal tax savings sufficient to cover the amount of the refund.
Wilson then elaborated on the documented authority for his recommendation, citing rulings by the Public Service Commissions of West Virginia, Montana and New York. West Virginia had ordered an immediate refund of the surplus rather than the two-year amortization proposed by Wilson. Montana had adopted a conditional two-year amortization. Under this plan, the utility would have two years to consult the IRS for an opinion on the tax ramifications on making an immediate or accelerated refund rather than amortizing over the useful life of the property. Absent a ruling contrary to the proposed method, the refund of the surplus would be paid with interest.
MPC's primary concern in this matter was that the IRS could construe the proposed amortization as a form of depreciation recapture. Wilson countered this concern with a quote from the New York Public Service Commission:
When the federal corporate income tax rate was reduced from 48% to 46%, an excess of $41,842,000 the company's accumulated deferred income tax account was created... . Staff recommended that the excess be returned over a five-year period; the CPB recommended two years; the Attorney General recommended one year....
The company contended in oral argument before us that it is nonetheless possible that the IRS may proscribe the treatment recommended by staff and the *899 Attorney General. In that event, the company is concerned its return of the excess over a short period of time will result in loss of its eligibility for accelerated depreciation income tax benefits. We recognize the possibility that a future adverse IRS ruling could be applied retroactively to revoke the company's tax benefit. For this to occur, however, the IRS would have to take the position that the existing statute, 167(e) of the Internal Revenue Code, required at all times whatever treatment is prescribed at that time by the IRS through its interpretative regulations. We believe that the risk of this occurring is so remote that it would be wrong to delay returning to consumers the excess accumulation solely on this basis. (State of New York Public Service Commission Opinion No. 79-22 issue November 9, 1979).
Nevertheless, MPC felt that any method of refunding the surplus other than over the useful life of the property giving rise to the fund would violate ง 167(l) of the Internal Revenue Code.[10]
PSC adopted Wilson's recommendation for a 2-year amortization without condition. It reasoned that the over-refunded amounts could be returned as soon as possible to the rate payers who provided the funds, thus rejecting MPC's argument on how the IRS might construe the refund and the contention that this method would result in a windfall to current customers. The chancery court reversed the PSC order, citing a previous ruling involving Mississippi Power & Light Company in November of 1980, as follows:
While it is the desire of the Commission to carefully consider any reasonable or proper "flow-through" adjustment which may benefit the ratepayer, care must be given to adhere to present tax laws and regulations and the possible effect of any such adjustment on the tax reserves so accumulated.
The rebuttal testimony offered by the Company supports the position that to adopt the "flow-through" adjustment recommended by the staff witness could jeopardize the entire Company reserve accumulated for deferred income taxes. Further, such an adjustment has been denied in other jurisdictions and at this time, until the issue is finally settled, the Commission is unable to accept this recommendation.[11]
After filing its appeal, the Power Company moved to submit new authority on this issue and presented the case of Kansas Power & Light Company v. State Corporation Commission, 5 Kan. App.2d 514, 620 P.2d 329 (Kan. App. 1980), which held that it was unreasonable for the Commission to require a five-year amortization when it could jeopardize the utility's entitlement to accelerated depreciation for tax purposes. It was determined that the excess deferred tax payment should be returned to Kansas rate payers over the life of the property giving rise to the funds initially.
The Kansas court cited Re New York Telephone Company, 32 PUR 4th 353 (N.Y. 1979), but was convinced by Kansas Power & Light that loss of accelerated depreciation might occur and by the fact that no one could show that Kansas Power & Light would not lose it. This opinion wholly ignores the fact that the IRS responded with a letter opinion in the New York case to the Telephone Company which stated that IRS regulations do not prescribe treatment of excess created in the deferred tax reserve when a corporate tax decrease takes place. The New York Commission held that the matter had been left to the states in view of IRS's response.
*900 Neither Kansas nor New York control this issue, but the New York holding is better supported by reason.
The proper exercise of PSC's sound discretion permits differing treatment of similar issues in different utility cases. However, in the absence of a clearly enunciated factual basis for making such a distinction between utilities, set forth in their order, such different treatment clearly constitutes arbitrary and capricious action by the PSC. Nonetheless, on the issue of the proper treatment of the excess in the reserve account in question, we hold that, in the absence of a definitive ruling by the IRS to the contrary, MPC's subscribers are entitled to the return of this excess as a matter of law. The chancellor's decision on this point is hereby reversed and the PSC's order returning this amount to the rate payers over a two-year period is reinstated. State of Mississippi, et al. v. Mississippi Public Service Commission, supra.
PSC's next assignment of error is:
The Chancery Court erred in holding that it was error for the Commission to utilize a part of the test year based upon projections and another part based on actual figures as they become available.
This issue involves a discrepancy in the "net plant" figures as proposed by MPC and as subsequently adjusted in the PSC's order. "Net plant" is a figure constituting a major portion of a utility company's rate base and represents the value of the physical generation and transmission facilities, etc. expressed as follows:

 Gross Plant Value (generally at cost or book)
 (less) - Accumulated Depreciation
 = Net Plant Value (this amount included in rate
 base).

In the calculation of the Net Plant figure utilized in MPC's test year figures, the value of the net plant which is includable in the rate base is determined by taking MPC's test year projections for the average first month net plant value and the average 12th month net plant value and averaging these two values in order to determine the average net plant value of the test year for the purpose of inclusion in the rate base. This figure, plus other allowances such as working capital, are combined to form the test year rate base. In the formulation of the test year projections for first month net plant value and 12th month net plant value, it is assumed that no major plant additions or retirements are included. This assumption utilized in the projection of these figures derives from the goal of having the test year figures represent a "normalized" typical year.
MPC's projected 1981 average net electric plant value was $506,788,000. In its order, PSC reduced this amount by $3,385,000 on the basis of the staff's calculations of average net plant which utilized actual beginning values (since by the time the hearings had reached this point in time, the actual figures had become available). PSC approved this adjusted figure, holding that "the staff is persuasive in explaining why that [MPC's] approach is less accurate than the alternative available here of using an actual beginning year figure."
MPC appealed this decision of PSC to the chancery court, which disallowed PSC's adjustment to the test year net plant figures, citing FERC opinion No. 44 issued June 28, 1979, in Public Service Company of Indiana, ER 76-149 and E-9537, and Indiana Municipal Electric Association v. Federal Energy Regulatory Commission, 629 F.2d 480 (7th Cir.1980), where the procedure of "selective utilization" of actual figures in the place of test year projections was disallowed. The chancery court held that "it was error for the Commission to utilize a part of the test year based upon projections and another part based on actual figures as they become available."
A staff witness testified that the problem inherent in such a method of calculating net plant value existed as to the verifiability of the utility's test year projections. These projections could be verified to a certain extent through either a continuing update of the test year figures or by comparing the utility's forecast with actual data. He testified that the requirement of continuing updates of a utility's test year projection could prove to be an enormous burden upon *901 a utility. Therefore, he concluded that the most efficient and effective method for checking MPC's test year figures was to compare their test year projection with actual data as it became available.
The staff recommended that the actual plant balances for the beginning of the test year period be utilized. Accordingly, they recommended a reduction in the net plant value component of the rate base by 3.385 million dollars.
MPC's comptroller testified that the use of actual plant balances by the staff constituted a "selective substitution" of actual data in an effort to provide a more accurate cost of service study. Nonetheless, he testified that this particular technique resulted in incorrect results. He testified that there were many components involved in rate-making, and that spot adjustments to the test year projection without corresponding adjustment to others distorted the impact of those figures as related to the whole. He also noted the fact that the FERC had rejected such selective substitution.
We hold that the chancellor's decision to disallow the $3,385,000 adjustment to the net plant value includable in the rate base should be reversed. It cannot be said that PSC's action in this aspect of the case was manifestly wrong in any respect or lacking of evidentiary support.
A utility's test year projections should bear as close a resemblance to actual future figures as modern economic forecasting procedures will allow. The accuracy of the test year must be established by the utility. State of Mississippi, et al. v. Mississippi Public Service Commission, supra. Since the actual rates will be determined with reference to such projections, it seems reasonable that the interests of accuracy are furthered through the use of the most recent and precise information available. This position has substantial support in the testimony of PSC's expert witness, and we therefore hold that the chancellor erred in reversing the PSC on this issue.
PSC's next assignment of error is:
The Chancery Court erred in disallowing the Commission's ruling that the ratepayers should receive the benefit of a rate base reduction equal to the average balance of the pre-1971 accumulated deferred investment tax credits which amount to $1,757,297, and holding that such action was a violation of equal protection and contrary to the evidence in this case.
Section 38 of the Internal Revenue Code [I.R.C. ง 38 (1976)] states essentially that Congress shall from time to time select certain forms of investment for which businesses may receive tax credit. Since 1962, there have been several forms of investment tax credit enacted and repealed, according to congressional discretion and the need for stimulus and growth in selected areas of the economy. The Revenue Act of 1962 did not specify how this tax credit was to be treated for the purposes of rate-making by state and federal regulatory commissions, but in 1964 the Act was amended to expressly prohibit federal regulatory agencies from using the tax credit to reduce cost of service. Until the investment tax credit was terminated in 1969, state regulatory commissions were free to determine the appropriate rate-making treatment for income tax savings resulting from the use of investment tax credit. Re: Gas Co. of New Mexico, 35 PUR 4th 106 (N.M. 1980).
In 1971, the investment tax credits enacted emphasized employment, especially the hiring of disadvantaged individuals. Congress' intent was that public utilities be able to benefit from Job Development Investment Tax Credit, should they desire to do so. The purpose of this tax credit was to provide funds which could be used to train new workers hired by a company, thereby reducing unemployment and stimulating the economy. There is no question as to whether or not post-1971 tax credits should be eliminated from the rate base. PSC eliminated only pre-1971 tax credits from the rate base, and this the chancellor reversed. PSC held that pre-1971 investment tax credits were not subject to the Internal Revenue Act of 1971, and could be eliminated from a utility's rate base.
*902 PSC's determination is supported by the often cited case of New England Telephone and Telegraph Company v. Public Utilities Commission, 390 A.2d 8 (Me. 1978), wherein the phone company, New England, argued that the public utilities commission erred when it reduced the rate base by an amount corresponding to the pre-1971 investment tax credits. The Court disagreed as follows:
New England raises a number of objections to the Commission's deduction of unamortized pre-1971 investment tax credits from its rate base. We find these objections unpersuasive.
New England argues that the Commission's actions of reducing its rate base prevents it from earning a fair rate of return on all of its property devoted to public service. However, as the Commission emphasizes, New England's investors are entitled to a return upon only that capital which has been supplied by the investors. Accordingly, New England is entitled to no return on capital supplied by consumers through their rate payments for a tax expense not actually paid to the federal government. We hold that this determination is properly within the discretion of the Commission and is entirely reasonable under the law and the facts of this case.
New England also argues that the Commission's decision is contrary to the policy of Congress in enacting the investment tax credit. The Commission agrees that federal tax law prohibits federal regulatory agencies from deducting these credits generated since 1964 and denies post-1971 tax credits where such credits are deducted by a federal or state regulatory agency from rate base. However, federal law is silent concerning state regulatory action with respect to pre-1971 investment tax credits. Whatever may be the federal policy and expectations with respect to other than pre-1971 investment tax credits, it does not control the Commission's actions in this case. Congress has apparently left the treatment of pre-1971 investment tax credits to the individual states. Therefore, the Commission could properly exercise its discretion and deduct such tax credits from New England's rate base.
390 A.2d at 54.
This issue was raised in State of Mississippi, et al. v. Mississippi Public Service Commission, supra, and we remanded for a determination of whether pre-1971 credit can be included in the rate base. In the instant case, the PSC had made such a determination. We reverse the holding of the chancellor and reinstate PSC's order as it applied to this issue. PSC's order is supported by both sounder reasoning and the law.
PSC next argues:
The Chancery Court erred in disallowing the Commission's reduction of rate base by the average balances of the account for property insurance reserve, the account for injuries and damages reserves and the account for customer advances for construction and in ruling same to be a violation of equal protection.
MPC's test year projections for the rate base figure, the sum total of the amount of property upon which MPC is entitled to a fair and reasonable return, included the amounts contained in three "reserve" accounts. These reserve accounts were for property insurance, liability insurance, and customer advances for construction. The two insurance reserve accounts were maintained by MPC in lieu of buying insurance policies for property and for liability purposes. It's not completely clear from the testimony exactly what customer advances for construction were.
PSC disallowed these accounts, holding that they were not properly includable in the rate base:
Customer Contributed Capital
The staff proposed that the Company's rate base be reduced by the average balance of Account 261 (Property Insurance Reserve), Account 262 (Injuries and Damages Reserve), and Account 252 (Customer Advances for Construction). As was shown by the staff's witness, Mr. Clark, these operating reserves and customer *903 advances are customer contributed capital that the Company has use of until such time as the reserve accounts must be debited for a loss or the advances are refunded. Mr. Clark's testimony shows that the Company fails to deduct or exclude these amounts from its rate base. This is wrong since it represents funds paid in by the Company's customers and the Company should not earn on it.
MPC appealed this adjustment of the rate base to the chancery court which held that PSC's actions in excluding these accounts from the rate base was a "violation of equal protection":
In lieu of insurance MPCo maintains reserves to cover the cost of replacement of plant items which may be damaged by a storm and a reserve for amounts MPCo may be legally obligated to pay by way of damages to persons, injuries or property damage as a result of its operations. The testimony shows that the insurance premium for complete coverage for injuries or property damage would exceed the annual amounts listed as expenses which go into these reserve accounts. In the Mississippi Power & Light Company order dated November 24, 1980, the Commission found that "customer deposits and advances are not actually cost free capital ..." The Commission now some four months later treats the Company in a different manner than Mississippi Power & Light Company, without explanation. Here, again, we have one set of rules for one electric utility and a different set for another. That is, in this Court's opinion, a violation of equal protection.
We hold that the chancellor erred in reversing PSC's decision to exclude the insurance reserves from the rate base. It appears upon a reading of the record that these insurance reserves, to which contributions were made on a regular basis by MPC, constituted an expense exactly like a traditional insurance expense would be incurred if MPC maintained policies of insurance on these respective categories. If MPC did indeed have an insurance policy, that policy would not be included in the rate base. Merely because MPC, from the perspective of a sound management decision, has elected one form of "insurance" over another, does not entitle MPC to include reserves in the rate base when MPC would not be entitled to include an insurance policy. Such an insurance policy represents an expense of doing business and is not investor-contributed capital so as to allow the utility a return.
We hold likewise on the question of the customer construction advances. No evidence is presented by MPC other than the testimony that PSC had decided differently in the Mississippi Power & Light Company case.
We have traditionally held that, when supported by an evidentiary basis in the testimony, customer deposits are generally includable in the rate base because in many cases the interest on such deposits is charged as an expense to shareholders. See State of Mississippi, et al. v. Mississippi Public Service Commission, supra; Mississippi Public Service Commission v. Mississippi Power Company, 366 So.2d 656, 661 (Miss. 1979); Mississippi Public Service Commission v. Mississippi Valley Gas Company, 327 So.2d 296 (Miss. 1936).
MPC's only testimony in favor of the inclusion of such amounts in the rate base was that PSC had done so in an earlier case. State of Mississippi, et al. v. Mississippi Public Service Commission, supra. By failing to put on any other evidence, they in essence are asking us to declare such amounts includable in the rate base as a matter of law. We decline to so hold. In the instant case, PSC's staff testified that the nature of the customer construction advances was that of capital contributed by customers. In the absence of any evidence on the part of MPC as to why such a statement is incorrect, we hold that the chancellor was in error in overturning PSC's ruling that such advances were improperly included in the rate base.
PSC's next assignment of error is:
The Chancery Court erred in finding that the cost of capital and the allowed *904 rate of return established by the Commission was unsupported by the evidence and contrary to the overwhelming weight of the evidence.
One of the primary determinations that must be made in any rate proceeding before PSC is the determination of the rate of return that will be applied to the rate base. In concise (although not necessarily precise) terms, this is PSC's determination of the amount of profit which the investors in the utility will be allowed to receive on their capital contributions to the utility. The problem which arises is how to arrive at a fair determination of an appropriate rate of return to which an investor is entitled. Based upon Blue Field Waterworks v. PSC of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), and Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), this "fair rate of return" has been analyzed and calculated in terms of a "cost of capital" perspective. In other words, obtaining capital, just like obtaining any other commodity or service, entails a cost. This cost takes the form of interest payments and dividends to the utilities' investors.
This "cost" to the utility for the use of investors' capital takes three separate forms: (1) debt securities, such as bonds, debentures, mortgage instruments, etc., which have a fixed rate of return and fixed maturity date, (2) preferred stock, wherein the return is fixed but the investment endures in perpetuity, and (3) common equity (or common stock) where the duration of the investment is in perpetuity and the dividend or return is determined on the basis of earnings of the utility. In the first two of these types of investor capital, the "cost" is contractually determined and therefore such capital costs are susceptible of an immediate, precise valuation. On the other hand, the "cost" of common equity is a flexible quantity contingent upon the utility's earnings.
In determining the overall cost of capital for the purposes of ascertaining the rate of return a utility is allowed to earn upon the rate base, these three types of capital costs are weighted so as to properly reflect the overall capital structure of the utility, and this weighted average, or overall capital cost, is used in arriving at the rate of return to be allowed on the rate base.
In the instant case, MPC's requested cost of equity capital was 16.04%. This cost of equity capital when properly weighted and combined with long-term interest costs and preferred stock dividends resulted in a requested rate of return on the rate base of 10.595% overall (as allocated to the retail base).
PSC's order noted that the determination of the cost of capital was important in a rate proceeding for the purposes of determining a fair rate of return. PSC recognized that this cost figure was not susceptible of precise mathematical determination but rather involved the use of "reasoned judgment in consideration of the numerous factors". PSC's order continues:
The reasonableness or unreasonableness of public utility rates is not to be determined by any definite rule or legal formula, and is not measureable with any degree of exactness, but is a question of fact calling for the exercise of sound discretion, good sense, and a fair, enlightened, and independent judgment.
PSC held that two standards were to be employed in determining whether a utility was being allowed a fair rate of return:
The standards are:
First, the return must be commensurate with returns on investment in other business enterprises having corresponding risks and uncertainties. Second, the return must be sufficient to assure confidence in the financial integrity of the business enterprise so as to maintain its credit and enable it to attract capital.
PSC, after this extensive review of the standards to be applied and of the evidence actually presented, reduced the overall rate of return on the retail rate base to 9.76%.
The order discussed the testimony of MPC expert witness, Dr. Willard Carleton, and concluded that Dr. Carleton's testimony *905 which had recommended a cost of equity capital at approximately 16% was not credible. This conclusion was based upon the finding that Dr. Carleton's calculations had been based upon certain invalid assumptions.
The order then discussed the testimony of a securities analyst, Mr. W.J. Honan, expert witness for MPC. While recognizing the importance of credit ratings to the ability of a company to obtain debt financing, PSC concluded that Mr. Honan's testimony basically consisted of what investors would prefer from a utility, rather than what they would require, with respect to the issuance of various types of capital securities:
In fact, it is this Commission's responsibility to determine the fair rate of return required by investors on the common equity of the Company. We are not required to determine the rate which they would prefer. We find that this approach may be useful for Mr. Honan's purposes in portfolio management. We have difficulty using the approach in the regulatory context.
PSC's order then turns to an examination of the testimony of staff witness, Dr. Wilson. The order approved the two methods of determining an appropriate cost of capital and overall rate of return by means of (1) the discounted cash flow analysis, and (2) an earned returns comparison to other electric utilities. PSC held that Dr. Wilson's application of these two techniques had resulted in a recommended range of return on equity capital between 13.5% and 14.5%. The inclusion of the appropriately weighted cost of equity capital within this range would result in an overall cost of capital between the range of 9.76% and 10.08%. PSC's order concluded with the holding that, as a result of various mismanagement and inefficiencies relating to the Plant Daniel transaction with Gulf Power Company, PSC was going to allow MPC the lowest return on equity capital, hence the lowest rate of return in both of Dr. Wilson's recommended ranges.
The highly technical testimony that was offered by both sides on the intricacies of the discounted cash flow method for calculating cost of common equity shows the importance of reliance upon PSC's expertise in these highly technical matters. As a result, we cannot say that the PSC's reliance upon Wilson's method of calculating the cost of common equity by his own particular DCF formula was inherently wrong, in the absence of other factors. Accordingly, we reverse the chancellor's decision.
MPC made the two following cross-assignments of error:
1. The chancery court erred in affirming the action of the Public Service Commission which reduced the rate base of the appellee/cross-appellant by $28,909,000 because of a disallowance of that sum in the fuel stock pile of appellee/cross-appellant.
2. The chancery court erred in affirming the action of the Commission in reducing revenue requirements of appellee/cross-appellant because of purported savings resulting from the filing of a consolidated income tax return of the Southern Company, parent of the appellee/cross-appellant, said reduction being $1,200,000.
The first cross-assignment of error decries the reduction of the amount allocated in MPC's fuel stock account in order to assure a reliable coal supply. In September of 1979, MPC claimed that this account would require $38,247,000 to cover the book cost of fuel on hand, freight expenses, rent, commissions, incidental taxes, and other related expenses. PSC reduced this to $30,764,321. Both parties had used a 90-day average coal requirement as the basis for their computations.
During the proceeding in question, MPC presented a request of $68,187,000 for its fuel stock account. Thirteen months had elapsed since MPC's last request for a rate increase, and the recommendation for this account had increased by 81%. This was due to the new basis for computation, the "60-day name plate" computation. Need for coal was to be projected based upon *906 what it would require to remain at peak burning capacity for 60 days. The change in the method of projecting need was said to be a more accurate reflection of the Power Company's attempt to head off numerous contingencies, such as possible coal-related strikes, bad weather, low water in the navigable rivers which supplied transport for coal, etc. However, PSC's witness pointed out that increased coal stocks during the test-year occurred due to the provision of fuel stocks for the new facility (Unit 2) at the Power Company's Plant Daniel and that construction delays caused coal supplies to increase.
The chancellor agreed with the use of the 90-day average burn method of projection used by the PSC, noting that the increase granted, $9,514,000 was a 31% increase, and that it could not be said that this was not supported by the evidence. MPC has shown no compelling reason for their change of projection methods or anything which would firmly establish the need for increasing the fuel stock account by 81%. We affirm the chancellor's holding.
The second cross-assignment of error suggests that the chancellor erred when he allowed the PSC's determination on tax savings resulting from consolidated tax returns to stand. PSC had found that these savings should inure to the benefit of the ratepayers since they were customer-contributed, cost-free capital. The chancellor agreed, citing a similar holding by the Connecticut Public Utilities Commission. Re: Connecticut Natural Gas Corporation, 37 PUR 4th 287 (1980). The same rationale was adopted by the PSC in a prior rate-hike request by the Power Company. Re: Mississippi Power Company, 36 PUR 4th 342 (1980). In finding that tax savings resulting from consolidated returns should be returned to the ratepayers, the chancellor quoted the following language from the Connecticut case:
It is patently obvious that if the Company's cost of service is not reduced by the tax savings resulting from the filing of a consolidated federal income tax return, the ratepayers are providing an outright gift to the Company and to the Company's parent and ultimately to the stockholders of the parent.
We affirm the chancellor's decision on this cross-assignment of error.
Mississippi Legal Services Coalition also took part in the hearings before the PSC and filed the following assignment of error:
The decree of the lower court was in error in that it affirmed the holding of the Mississippi Public Service Commission in that it did not have substantial evidence upon which to make findings of the impact of the adopted rates on the ability of the consumer to purchase electric power from Mississippi Power Company, and was thus an error of law and a violation of the Equal Protection Clause of the United States Constitution.
The learned chancellor, citing holdings in Ohio, Idaho and Utah,[12] concluded that PSC held correctly and there was no merit to the contention that a study should be conducted as to the impact on consumers before PSC can consider a rate increase. We affirm the chancellor's decision on this issue.
Our decision in this complicated and voluminous case has been reached after meticulous consideration of highly technical evidence and experts' opinions.
This cause is remanded to the Mississippi Public Service Commission for proceedings not inconsistent with this opinion, and pursuant to Mississippi Code Annotated ง 77-3-33 (1972).
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
AS TO PART I: PATTERSON, C.J., and ROY NOBLE LEE, BOWLING, and PRATHER, JJ., concur.
AS TO PART I: BROOM, P.J., and HAWKINS and ROBERTSON, JJ., dissent.
*907 AS TO PART II: PATTERSON, C.J., and ROY NOBLE LEE, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
AS TO PART II: DAN M. LEE, J., specially concurs as to unnumbered assignments of error 1 and 2 only of Part II.
BOWLING, HAWKINS and DAN M. LEE, JJ., specially concur.
WALKER, P.J., not participating.
BOWLING, Justice, specially concurring:
This is designated as a specially concurring opinion, as I understand the entire cause is being remanded to the Public Service Commission pursuant to the opinion this day published by the Court. In the event the matters hereinafter discussed are not material to the issues in the opinion of the Public Service Commission on remand, this might be referred to as a dissent.
The basic terms around which revolve all the lengthy evidence, opinions and briefs in a public utility rate case, such as this, are "rate base" and "rate of return." Many thousands of words are written around those principles. In my humble opinion, they all revolve down to the simple proposition of how much a citizen, poor or rich, should contribute to the public utility in order to keep that utility servicing those citizens. There is one glaring situation that I cannot understand or agree with when the base rate and rate of return of appellee is considered. As stated in the order of the Public Service Commission, appellee Mississippi Power Company, is solely, wholly, completely and totally owned by The Southern Company, a holding utility company based in another state. In addition to appellee company, this Southern Company owns three other local utility companies comparable to appellee Mississippi Power Company. This includes Gulf Power Company that appeared prominently in the present cause. It might be trite to say that no one could argue with the statement that if one entity completely owns another entity and receives all the profits from the second entity, the first entity controls the second entity completely. In the case at bar, The Southern Company obviously owns and completely controls Mississippi Power Company. The situation that concerns me now is that The Southern Company published its earnings for the year ending December 1982. These earnings were $472,300,000 for the twelve months' period as compared to $326,000,000 for the prior year 1981. It is readily seen that this is an increase of over forty-four percent (44%).
Of course, I do not know the percent of net receipts received by The Southern Company from its four wholly owned subsidiaries. The point I am making is that, in my opinion, under the applicable statutes, it is the duty of the regulatory agency, supervised by the courts, to ascertain the part Mississippi Power Company plays in this tremendous increase in earnings by its alter ego. It should not be any great expenditure of time, money or expertise for this information to be furnished the regulatory agency, which is responsible by law to protect the persons taking care of the "rate base" and "rate of return." The above statement is further brought out by both the opinion of the Public Service Commission and this Court in discussing the questions of the investor who is buying and holding equitable securities on which dividends are paid. As stated, every payment under these equitable securities of Mississippi Power Company goes into the bank account of its owner, The Southern Company.
We are in truth and in fact discussing the requirements and positions of equity owners of The Southern Company, rather than Mississippi Power Company. Certainly under the directions of the applicable statutes the regulatory agency for the people of this state have an obligation to fully investigate the entire picture that resulted in Southern Company's more than forty-four percent (44%) increase in earnings. The inquiry should not be confined to the local subsidiaries "base rate" and "rate of return." A red flag is waved to this writer when he reads the opinions which grant appellee a *908 rate of return of between nine and ten percent and then reads the published statement of appellee's owner that its earnings have increased more than forty-four percent (44%) within a twelve month period of time during the pendency of this cause.
I therefore concur in remanding the cause to the Public Service Commission, but would specifically call to its attention the statutes and the above set out discussion in the commission's review of the cause.
HAWKINS and DAN M. LEE, JJ., join in this specially concurring opinion.
DAN M. LEE, Justice, specially concurring as to Part II:
This is designated as a specially concurring opinion as to Part II of the majority opinion. While I concur in the result reached in reversing the chancery court and reinstating the PSC's order, the opinion contains certain language which, in my opinion, seems to be in conflict with the result reached.[1] Therefore, I find it necessary to concur in the result only.
The majority of the issues presented in the case at bar were likewise presented in State of Mississippi Ex Rel Bill Allain, Attorney General, et al v. Mississippi Public Service Commission, No. 53,709, decided March 9, 1983, not yet reported (hereafter No. 53,709). Although the results reached on the various issues presented in the case sub judice are the same as those reached in Case No. 53,709, an apparent conflict has surfaced between the two decisions regarding the reasoning employed in unnumbered assignments of error 1 and 2 of Part II. This conflict is especially apparent in that portion of the decision today involving the use of an "historical trended" analysis as opposed to a "projected test year" and use of "lead/lag" studies in arriving at the rate base for the utility. Both cases were considered by the Court en banc and determined to be in harmony with each other.
Even though this opinion may follow, Case No. 53,709 by only a few days or weeks, the language contained in the case sub judice, which is contrary in my opinion, to that in Case No. 53,709, should be read as conforming with the rulings in the decision heretofore handed down on March 9, 1983. More specifically stated, if any rulings in the case sub judice appear to be in conflict with those in Case No. 53,709, then, and in that event Case No. 53,709 shall prevail.
I therefore concur in remanding this case to the PSC, but concur only as to the results reached in the first two assignments of error under Part II of this opinion, and specifically call the attention of the commission to Case No. 53,709 as controlling any conflicts that arise between the two.
BROOM, Presiding Justice, dissenting as to Part I:
Having authored the entire majority opinion except the ten pages comprising PART I, I am not able to concur as to PART I. With all due deference to the views expressed by the majority of my colleagues on the question of the Plant Daniel transaction, I feel constrained to respectfully express my dissent from those views set forth in PART I.
A close and careful scrutiny of both the reasoning and the result expressed in the majority view of the treatment of the Plant Daniel transaction clearly reveals a misconception of the basic function of the PSC's role as the interface between the public as consumers and the utilities as suppliers. As very recently observed in State of Mississippi, et al., v. Mississippi Public Service Commission, (No. 53,709, decided March 9, 1983, not yet reported):
Mississippi Code Annotated ง 77-3-39 (1972), authorizes the Commission to establish rates that are just and reasonable to the ratepayers and which will yield a fair rate of return to the utility for its services. In effect the Commission is the counterpart of the market place by which *909 other businesses are measured. This is so because public utilities are monopolies engaged in the business of furnishing necessary services to the public. Obviously, the legislative intent in creating the Public Service Commission was to interpose an authoritative body between the ratepayers of the utility and the investors in the utility so that their respective interests, necessarily antagonistic, might be equitably served.
Succinctly summarized in that opinion are the goals and policy considerations behind the regulation of public utilities:
The crucible of the competitive public market place to which business concerns, other than monopolies, are necessarily exposed is thus avoided so that economic waste by overlapping and duplicating services will not occur.
The "crucible of the competitive public market place" in a freely competitive arena is without question the best overall method for assuring the maximum efficient production of a product at the lowest possible price. This maximum degree of efficiency is achieved by "squeezing out" the less efficient producers and the poorer potential consumers. Such "squeezing out" is accomplished very simply: They go out of business.
The economic "natural selection" or "survival of the fittest" which is experienced in the free and open competitive market, is not without its attendant social and economic costs: (1) economic and social dislocations which result from the failure of the less efficient producers to survive; and (2) duplication of effort and the attendant waste resulting from overlapping use of limited resources.
In the case of public utilities, these attendant social and economic costs have been weighed against the potential result of free and open competition with respect to the supplying of such utility's services and have been determined by state legislatures and the United States Congress to be unacceptable. When public utilities are involved, the dislocations resulting from the "crucible of the competitive public market place" can be disastrous. Visions come to mind of the social and economic chaos which would result from competition causing an electric company to go out of business in the dead of winter. Likewise, the combination of utilities' capital-intensive nature along with the economies of scale underlines the potentially enormous waste possible if two competing electric utilities were to build two competing facilities when only one such facility would be required to adequately serve the public's needs.
At the other end of the scale is the "pure" monopoly whose great potential for the abuse of economic power, and whose unremitting history of inefficiency have resulted in the determination that such a means of providing basic public services is also totally unacceptable.
The compromise which has been sought for the provision of basic public services has been that of the "regulated utility" which in essence grants a monopoly over the provision of services but which subjects the company providing those services to public oversight and control. Such regulated utilities are not normal monopolies with their comparative free hand in the market place[1] but rather exist as regulated monopolies with the function of such regulation being to take an overview of both the public needs and the utilities' capabilities so as to closely correlate supply and demand, and thereby provide such services as efficiently as possible. This is the function of the Public Service Commission.
How this regulation is to be accomplished is a never-ending issue. What tools has the PSC for matching up market place needs and utility capabilities as efficiently as possible? This regulation is accomplished in two ways:
The first of these is that the PSC controls the growth of utility facilities through the issuance of a certificate of public convenience and necessity. This authority devolves *910 upon the PSC by virtue of Mississippi Code Annotated ง 77-3-11 (1972):
ง 77-3-11. Certificate of public convenience and necessity required.
(1) No person shall construct, acquire, extend or operate equipment for manufacture, mixing, generating, transmitting or distributing ... electricity, ... for any intrastate sale to or for the public for compensation, or for the operation of a public utility operating a business and equipment or facilities as contemplated by subparagraph (3) of paragraph (d) of section 77-3-3, without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require the operation of such equipment or facility. (Emphasis added).
In Mississippi Power & Light Company v. Blake, 236 Miss. 207, 109 So.2d 657 (1959), this Court commented upon the meaning of the predecessor to the above cited statute:
In view of the above language, this Court in Mississippi Power & Light Company v. Town of Coldwater [234 Miss. 615], 106 So.2d 375 (Miss.) said that the trial court erred in holding that it was not necessary for the co-operative there involved, before making a construction or extension of its facilities at an expense of more than $35,000, to obtain from the Public Service Commission a certificate of public convenience and necessity. In other words, the statute meant what it said. (Emphasis added).
236 Miss. at 218-19, 109 So.2d at 661.
We went on to note:
The action of the Commission, in granting a certificate, cannot be overturned if it is supported by substantial evidence, and is not arbitrary or capricious, or beyond its power to make, and does not violate some constitutional right.
Id., at 219, 109 So.2d 661.
In other words, through the issuance (or refusal to issue) of a certificate of convenience and public necessity the PSC exerts a degree of control upon certain of the assets which will be includable in the utility's rate base. See Mississippi Code Annotated ง 77-3-43 (1972). This function is consistent with the policy of preventing waste and duplication of both facilities and efforts. Capitol Electric Power Association v. Mississippi Power & Light Company, 240 Miss. 139, 125 So.2d 739 (1961).
The PSC's issuance of such a certificate must be based upon substantial evidence that the public necessity requires the existence of such a proposed facility. Like any other procedure before the PSC, the burden of proof to establish such public convenience and necessity is upon the utility and, like any other proceeding before the PSC, the PSC's order is presumed to be correct. It seems abundantly clear that such a determination by the PSC that the public convenience and necessity require the construction of additional facilities includes ipso facto the PSC's conclusion that such addition will be both used and useful in the generation of electricity. Under Mississippi Code Annotated ง 77-3-33(1) (1972), the legislature has specifically provided that a utility is entitled to a fair rate of return "upon the reasonable value of the property of the utility used or useful in furnishing service." (Emphasis added).
The second method by which the PSC regulates public utilities is through the regulation of the rate of return a utility is allowed to earn upon such property which is used or useful in the provision of service. After determining what property is used or useful in providing service, the PSC is empowered to determine what constitutes a fair rate of return on that rate base, or, in other words, to determine that to which the investors are entitled as a fair return for the public's use of their property in the generation of electricity. With this basic analysis of the function of the PSC in mind, it is appropriate to turn to a slightly more detailed examination of the factual situation surrounding the Plant Daniel transaction than is set forth in the majority opinion. Events surrounding the Plant Daniel transaction between MPC and Gulf Power are set out in the rebuttal testimony of H.H. Bell, MPC's vice president in charge of engineering and operation.
*911 In October of 1970, a decision was made to build Plant Daniel in Jackson County. This decision was based upon studies indicating that MPC's production requirements were going to be growing to the extent that by 1976 the utility would have a production deficiency of approximately 500 megawatts. These figures and the original plans for Plant Daniel were submitted to PSC, and approved, and a certificate of public convenience and necessity issued. Plant Daniel was originally conceived as fueled by low sulphur coal, but with the promulgation of the Clean Air Act in 1972 and certain logistical problems concerning dredging the river for coal barges, the decision was made to have the plant fueled by low sulphur oil.
In 1973, based upon projections showing a further increase in the demand for electricity, plans for a second unit at Plant Daniel were announced. Once again the plans were submitted to PSC and approved. In 1973, the Arab oil boycott and the subsequent unreliability of a steady oil supply necessitated the decision to modify the plans for both units back to coal. This decision was made early in 1974, and an updated construction budget showed an increased cost of approximately $44,000,000.
In 1974, MPC postponed the completion date of Unit 1 from 1976 until 1977, (and unit 2 from 1978 until 1979), as a result of difficulties MPC was encountering in obtaining financing for unit 1. This was caused by declining earnings which resulted from the inability to sell a sufficient amount of long-term securities in order to finance this construction.
When construction was resumed on unit 1, MPC announced that it was entering into negotiations with Gulf Power Company on a plan for joint ownership of the entire Plant Daniel facility. Under terms of the agreement which was finally reached between MPC and Gulf Power, Gulf Power was to take over the financial obligation to complete unit 2. Likewise, Gulf Power was to pay MPC 1/2 of the amounts already spent by MPC in the construction of certain common facilities to be utilized by both units of the Plant Daniel facility. Upon completion of both units, MPC and Gulf Power were to "adjust their accounts" so as to reflect that each company owned a 1/2 undivided interest in the entire Plant Daniel facility (as opposed to each company owning an individual unit and sharing the common facilities). Pursuant to Mississippi Code Annotated ง 77-3-11 (1972), this plan was presented to PSC along with the results of studies showing a marked decrease in the projected growth rate of electricity demand, and the entire agreement was approved by PSC. Mississippi Power & Light Co. v. Blake, 236 Miss. 207, 109 So.2d 657 (1959); Mississippi Power & Light Co. v. Coldwater, 234 Miss. 615, 106 So.2d 375 (1958). No ceiling was placed on costs relating to the facility, and PSC's excluding the Plant Daniel costs, after having first approved the construction, runs capriciously against the grain of its official act granting the Certificate of Public Convenience and Necessity as per the applicable statute, ง 77-3-11, supra. As a part of this agreement, the completion date for unit 2 was postponed from 1978 to 1980. After MPC and Gulf Power entered into the above described agreement, Gulf Power deferred this completion date one additional year until 1981.
As a result of the time delays and other various cost overruns, the final cost of Unit 2 exceeded the final cost of Unit 1. Therefore, part of the "adjusting of accounts" between MPC and Gulf Power necessitated the payment of approximately $40,000,000 ($38,000,000: plant; $2,300,000: coal cars) in order for the accounts to reflect an undivided 1/2 ownership in the entire Plant Daniel by each company. PSC contends that a portion of this amount should not be includable in the rate base for essentially two reasons: (1) the entire transaction did not result in any increase in electricity producing capacity of MPC[2]; and (2) MPC's customers *912 should not be required to bear the burden of cost overrun attributable to the inefficient management of both MPC and of Gulf Power.
MPC contends that the chancellor's decision in overruling that portion of the PSC order which deducted approximately $20,000,000 associated with the Plant Daniel transaction from the rate base was correct. MPC points to the chancellor's rationale in overruling that portion of the PSC order: (1) no evidence was presented by any staff witness recommending such a reduction in the rate base, (2) no explanation or evidence was given for the choice of the amount by which the rate base was reduced, and (3) there was no proof that the decision to sell Gulf Power a 1/2 undivided interest in Plant Daniel under the terms of their agreement was unreasonable or irresponsible.
Testimony by MPC indicated that the transaction between MPC and Gulf Power had been based upon the sound business decision that selling a 1/2 interest in the entire Plant Daniel facility was superior to the idea of either selling one unit to Gulf Power or canceling construction completely. Canceling plans for Unit 2 would have been prohibitively expensive. Unrefuted testimony showed that MPC's decision to sell a 1/2 interest to Gulf Power, as approved by the PSC, saved $55,000,000 over any other alternative available in 1976 when the decision was made.
PSC's staff witness Mr. John Wilson testified that the addition of Unit 2 of the Plant Daniel facility would result in no increase in electric generating capacity to MPC. It is important to note that the staff's recommended reduction in the rate base does not include any recommended reduction in MPC's proposed rate base as a result of the Plant Daniel transaction (other than the reduction based upon the purchase of the railroad coal cars).
Q. Have you reviewed the Company's proposed test-year adjustment to account for the increased costs of Unit No. 2 of the Jackson County Plant?
A. Yes. Pursuant to the Commission's Order of August 27, 1976, in Docket U-3168, MPCo sold a one-half undivided interest as tenant in common in its Jackson County steam plant to Gulf Power, an affiliated member of The Southern Company system. This transaction was proposed due to MPCo's earlier overestimate of its own generation capacity requirements and Gulf's corresponding need for more capacity at a time when MPCo's Jackson County plant was under construction. The Commission approved the proposed sale based on the belief that it would be in the best economic interest of both the Company and its customers. (Emphasis added).
At this juncture it should be noted that the evidence clearly showed that MPC saved $55,000,000 over any other alternative available in 1976 when the PSC approved the Plant Daniel transaction. Hence its belief was well founded and certainly there was no proof in the present proceedings as to any alternative in 1976 that would have been better.
PSC staff witness Mr. Wilson continued:
Q. Were the financial details of the proposed transaction specified and approved in the Commission's 1976 order?
A. No; the Order simply stated that after Unit 2 was completed "the necessary adjustments" would be made so that each party would have a 50% ownership interest in both units and the common facilities. No financial details as to "the necessary adjustments" were specified. It is clear however that the Commission did contemplate that the transaction, as ultimately consummated, would be economically beneficial to all concerned and would thus serve the public interest.
*913 Clearly, all the evidence showed that the transaction approved by the PSC in 1976 was economically beneficial to all concerned. Continuing with the testimony:
Q. Are the specific financial details, as proposed by MPCo for ratemaking treatment in this case, consistent with the Commission's 1976 determination that the transaction be in the best economic interest of both the company and its customers?
A. That is questionable. The end result of the Company's proposed ratemaking treatment here is to substantially increase the financial burden of Mississippi consumers without giving them one more kilowatt of electricity. This result occurs because upon completion of Unit 2 at the Jackson County Steam Plant (which has been owned and financed by Gulf pursuant to the Commission's approval in 1976) MPCo will, in effect, trade Gulf a half interest in its own Unit 1 for a half interest in Unit 2. Of course, since Unit 1 was completed about four years earlier than Unit 2, Unit 2 is more costly and thus the trade results in a substantial increase in the cost of MPCo's rate base without any addition of capacity.
Mr. Wilson failed to address the vital question: "What would have been the effect on the rate base had MPC not proposed the transaction?" Unrefuted, unconflicting testimony shows that that cost of rate base would have been increased by an additional $55,000,000.
Mr. Wilson testified further:
Q. Is the excess cost of Unit 2 over Unit 1 more than was contemplated at the time the Commission approved the transaction?
A. Yes. While the Company reported in 1977 that the cost to MPCo would ultimately amount to $16 million, the amount actually proposed as a rate base addition in this case is $38 million. While the Commission may determine that an appropriate rate base adjustment is warranted in this regard, I believe that, at a minimum, this cost-over-run should be considered in arriving at the allowed rate of return in this case, and that such consideration warrants a return allowance at the bottom of the applicable range.
In retrospect, the arrangement proposed with respect to Unit 2 of the Jackson County plant, appears to be a far better deal for others in The Southern Company than for MPCo.
Interestingly enough, the figures which Mr. Wilson quotes are from 1977, while the order approving the Plant Daniel was in 1976. He did not address himself to the question of whether a specific dollar figure was ever within the contemplation of the PSC at the time of the approval of the transaction. Most significant are Mr. Wilson's prefatory words to this latter comment โ "In retrospect ..." The use of retrospect in evaluating the results clearly precludes the existence of any "mismanagement" because the concept of "management" necessarily involves application of data in a prospective manner.
Finally, Mr. Wilson noted:
Q. Are there certain aspects of the Jackson County Unit 2 arrangement where cost disallowances are clearly called for?
A. Yes. As my associate, Mr. Clark, has pointed out, the cost of Unit 2 coal stocks should be excluded from MPCo's rate base in this case. In addition, increased rail car costs should also be excluded. On May 13, 1977 in its order in Docket U-3245, this Commission permitted MPCo to purchase 230 coal cars at a cost of $35,000 each to serve the Jackson County Plant. Now the Company proposes, in effect, to exchange half of those cars with Gulf for corresponding cars costing $44,900 each. This unwarranted rate base addition of $1,138,500 should be disallowed. The computation of this disallowance is shown in [this] Exhibit.
This testimony is the only testimony suggesting specific reductions from the rate *914 base. As can be seen above, the only other recommendation Mr. Wilson made was that the rate of return (not the rate base) be the lowest in the acceptable range. Of course, since it is evident that Mr. Wilson has given no evidence of mismanagement, even this recommendation is without evidentiary basis.
Other staff witnesses admitted that the only way of determining the fact that Plant Daniel Unit 2 was not necessary was by virtue of "20-20 hindsight."
A. Obviously in my opinion, with 20-20 hindsight, it was not necessary to build Plant Daniel 2. Otherwise the company would not have sold half of 1 and 2... .
... .
Q. Mr. Clark, when you said looking at Plant Daniel with 20-20 hindsight, you're not criticizing the decision that the Mississippi Power Company made to construct Plant Daniel at the time it was made, are you?
BY THE WITNESS:
A. I was not involved in that decision making process or involved as a witness or in any other way involved at that time. This Commission certified the building of Plant Daniel Unit number 2, and at that time I assume that the company's position was that it was necessary.
Q. This Commission approved both the Daniel 1 and Daniel 2 units.
A. I assume they did. I haven't seen the Daniel 1 Order, but I understand that they do have to certify that construction.
There was no testimony by the staff that MPC's Plant Daniel decisions or actions were the result of poor management decisions when viewed from the context in which those decisions were made. The worst thing stated by any staff witness as to the financial details of Plant Daniel was that it was "questionable" based upon "20-20 hindsight." Neither was there any indication that those decisions were made in bad faith, fraudulent, or solely calculated to raise the rates charged the customers. Incredibly, testimony was given by the PSC staff that the transaction as proposed had been approved by PSC based upon a belief that the best economic interest of the customers and MPC required the transaction. Now the facts have indeed born out this belief, to the extent of $55,000,000, yet the majority deems it necessary to "punish" MPC for complying with the PSC's regulatory actions with respect to the effect of the Plant Daniel transaction.
In view of the fact that the PSC's function is regulatory in nature, such a retributive attitude would seem far more indicative of the PSC's failure to properly ascertain whether or not a utility's burden of proof had been met when that utility was seeking a certificate of public convenience and necessity. It is certainly an inappropriate response to the alleged "fault" of the utility for some type of amorphous "mismanagement" discernable only when that utility's actions are subjected to postmortem dissection in the light of 20-20 hindsight. Such a position both on the part of the PSC and on the part of the majority bears an ominous resemblance to the reactionary type parent who after giving permission to a young boy to go out and play in the rain proceeds to beat him unmercifully upon his return because the boy got wet.
The majority opinion in PART I comments that utility rate proceedings are never final. While generally it is true that ratemaking is an on-going process, such is not true in the instant case. The effect of the PSC's decision as upheld by the majority of this Court today is to exclude a certain portion of the cost of Plant Daniel from MPC's rate base. In other words, PSC and this Court have said that a certain portion of MPC's expenditures on Plant Daniel may not ever be included in those assets upon which MPC is entitled to receive a fair rate of return. It would seem clear that this is a final determination and, barring a change in the statutory provisions, such determination would be res judicata on the question of this portion of the Plant Daniel expenditures. See City of Jackson v. Holliday, 246 Miss. 412, 149 So.2d 525, 526 (1963), wherein we stated:

*915 The common law doctrine of res judicata, including the subsidiary one of collateral estoppel, is designed to prevent relitigation by the same parties of the same claims or issues. The reasons behind the doctrine, as developed in the courts, are fully applicable to some administrative proceedings, partially applicable to some, and not at all applicable to others. The doctrine is best applied to an adjudication of past facts... .
... .
A judgment bars a subsequent application for the same purpose where the facts upon which it is based are not changed and the conditions are substantially similar.
246 Miss. at 419-20, 149 So.2d at 527-28.
Under today's ruling by the majority, MPC will never be able to earn any rate of return whatsoever on property which the PSC had previously determined to be necessary for the convenience of the public, and therefore to be used and useful in the generation of electricity. It is important to understand that the effect of today's decision by the majority is not to directly reduce the rates requested by MPC by $19,000,000, but rather to reduce the valuation of the assets upon which MPC is entitled to a fair rate of return.
PART I of the majority opinion sets forth some principles and tenets of review which guide this Court in the appellate review of ratemaking proceeding. With deference I must respectfully take issue with 5b. in that list as an interpretation or construction of 5a. 5a as set forth in the majority opinion states:
5a. The chancery court's authority on review is limited by Mississippi Code Annotated section 77-3-67(4) (1972) to: The order shall not be set aside in whole or part except for errors of law, unless the court finds it is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of statutory authority or violates constitutional rights.
5b. on the other hand would seem to indicate that the sole question presented to this Court in appellate review of a ratemaking procedure before the PSC which has been appealed to the chancery court and then finally to this Court is whether the evidence supported the PSC's decision:
5b. The authority of 5a has been construed at times as follows: The sole question presented for decision is whether or not the action of the commission was arbitrary, not supported by substantial evidence, or was manifestly against the evidence. Tri-State Transit Co. of La. v. Dixie Greyhound Lines, 197 Miss. 37, 19 So.2d 441 (1944).
This constitutes somewhat of an over-simplification of the five specific areas which are opened to our consideration in reviewing the PSC's action. These five areas are: (1) errors of law; (2) that the PSC's decision is not supported by substantial evidence; (3) that the PSC's decision is contrary to the manifest weight of the evidence; (4) that the PSC's decision is in excess of its statutorily granted authority; and (5) that the PSC's decision violates constitutional rights.
The standard of review which this Court is bound to observe in appellate review of a ratemaking case is not merely to cursorily examine the PSC's order to determine whether they have uttered a sufficient number of "magic words." Rather we are required to examine any such order to see if it passes muster as to the five aspects listed above.
We are not triers of fact. We are not intended to be "experts" in the highly technical intricacies involved in a ratemaking proceeding. But neither are we blind. This Court has consistently stated that when the PSC's decision does not violate a constitutional right and when that decision is not in excess of the statutory authority, then it will be upheld on appeal if it is supported by substantial evidence and it is not contrary to the manifest weight of the evidence. With this tenet of appellate review in mind, we have required the PSC when appealing from a chancellor's decision in overturning its order merely to point to that evidence which it deems to be the *916 substantial evidence supporting its decision. Mississippi Public Service Commission v. Mississippi Power Company, 366 So.2d 656 (Miss. 1979); Mississippi Public Service Commission v. Mississippi Valley Gas Company, 327 So.2d 296 (Miss. 1976). This is not requiring the PSC to shoulder an additional burden of proof but is merely a procedural requirement that it tell this Court what the PSC considers to be substantial evidence. In view of the fact that utility cases typically consist of several thousand pages of testimony, requiring the PSC to point to what it considers to be substantial evidence is eminently reasonable particularly in view of their highly specialized expertise, and our lack of such.
In the instant case, the wisdom of that requirement is highlighted. The PSC did not point to any evidence of any of the following:
First, the PSC did not point to any evidence in the record of what the reasonable value of MPC's undivided 1/2 interest in Plant Daniel was. The only piece of evidence in the entire record which would tend to vaguely illuminate such a question is Mr. Wilson's testimony that if the decision to build Unit 2 had never been made, Unit 1 would now be cheaper. This type of subjunctive reasoning is vaguely reminiscent of the farmer who observed that "If the cow gave buttermilk, we wouldn't have to churn."
Second, the PSC has failed to point to any evidence of mismanagement by MPC. The only criticisms appearing in the record are qualified by both witnesses as being possible only by virtue of hindsight. There has been no evidence tending to show the invalidity of the PSC's 1976 order. The majority opinion goes to great lengths to point out that any order issued by the PSC is presumptively correct. Surely MPC is likewise entitled to rely upon such a presumption of correctness of its certificate of public convenience and necessity issued by PSC. The PSC may indeed have been lax in determining whether Unit 2 of Plant Daniel was necessary. If so, the fault lies with the PSC, not with MPC. Seeking to punish MPC for the regulatory failure of the PSC can only inure to the long-term detriment of electric subscribers in this state.
Thirdly, the PSC did not point to any evidence of any option or alternative which was available to MPC in 1976 which would have had better results. It seems totally incredible for MPC to have gone to the PSC with a plan for remedying a bad situation, have the PSC approve such plan at every stage, and then when MPC seeks to include such expenditures in its rate base for the PSC to pull the rug out from under it. This is particularly incredible when the proof shows that MPC and its customers are $55,000,000 better off than they would have been with any other alternative.
Fourthly, there is no testimony in the record that any specific amount should be excluded from the rate base other than the fuel stocks (which were excluded by the chancellor and affirmed by the majority) and the additional expenditure for coal cars. Quoted and accepted with approval by the majority is testimony that MPC should not be allowed credit in its rate base for 230 coal cars in which Gulf exchanged a 1/2 interest to MPC at $44,900 each. Basis of this thesis is the evidence that PSC "permitted MPCo to purchase 230" at $35,000 each and therefore should not allow for the cost of any cars at $44,900. What the majority seemingly fails to comprehend are the following facts concerning these cars:
The evidence clearly shows that there was a total of 460 coal cars purchased. The 230 cars which the PSC allowed to be purchased at $35,000 each were purchased at that price by MPC for supplying coal to Unit 1. When Unit 2 was being readied for operation 4 years later, Gulf Power purchased the additional 230 cars at $44,900, the then-current price. The 460 coal cars are used in common by both Units. Because the second 230 coal cars were purchased by Gulf Power to provide sufficient coal for Unit 2, the purchase of those cars is not controlled by the order allowing the purchase of the first 230 cars. It is instead controlled by the 1976 PSC order approving *917 the entire Plant Daniel transaction whereby Gulf Power assumed the financial obligations for Unit 2 and then MPC and Gulf Power were to adjust their accounts to reflect equal ownership. This they have done without any fraud and in exact compliance with PSC's order.
For the PSC to exclude the Plant Daniel expenditure from the rate base in contravention of its prior order without any substantial evidence upon which to base such an exclusion clearly and unequivocably constitutes arbitrary and capricious action. The reason the PSC has failed to point to evidence of any of those four things is because the evidence is not there.
Today's decision in disallowing the inclusion in the rate base of amounts resulting from a transaction which was specifically authorized by the PSC conflicts with very appropriate language which may possibly have been overlooked: "[N]or shall any state deprive any person of life, liberty or property without due process of law;" United States Constitution, Amendment XIV; see Blue Field Water Works v. PSC of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1922), and Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). See also, Mississippi Constitution of 1890, Art. 3, ง 14.
For the reasons outlined above, I respectfully dissent.
HAWKINS and ROBERTSON, JJ., join in this dissent.
NOTES
[1] That part of the Court's opinion designated PART I is authored by Dan Lee, Justice, to which Broom, P.J., dissents.
[2] Miss. Pub. Serv. Comm'n. v. Miss. Power Co., 337 So.2d 936, 938, 939 (Miss. 1976).
[3] As required by the PSC's rules of practice and procedure, Rule 7(a)(6).
[4] A somewhat more detailed description of the derivation and application of the "45-day formula" is presented infra.
[5] It is important to note that the PSC's "Finding of Fact" anticipates the result of a study to be done in the future. Nonetheless, the Commission proceeded to make a factual determination of the cash working capital component of the rate base based upon the results of a study which had not been done.
[6] Note that in State of Mississippi v. Mississippi Public Service Commission, supra, a lead/lag study was actually performed.
[7] AFUDC represents interest on borrowed funds, dividends on preferred stock, and the imputed return on common stock.
[8] See Federal Power Service, Rules and Regulations, Part 104, pages 2-183.
[9] He called this "full normalization".
[10] ง 167 of the Internal Revenue Code deals with rules and regulations as to the methods of taking depreciation benefits on business property. ง 167(l) applies specifically to public utilities.
[11] When the above-quoted case was appealed to this Court (State of Mississippi, et al. v. Mississippi Public Service Commission, supra), we rejected this treatment and remanded for "a determination of the appropriate method and time" for returning this excess. In the instant case, such a determination was made by the PSC.
[12] West Jefferson Power & Light Co., PUR 1933D, 164 (Ohio, 1933); Mountain States Telephone Co., 22 PUR 3d 490, 496 (Idaho, 1958); Telluride Power Co. v. Public Service Com'n of Utah, 8 F. Supp. 341 (D.Utah, 1934).
[1] Pertaining to unnumbered assignments of error 1 and 2 only of Part II.
[1] Of course, the extent to which such a "free hand" may in fact be exercised depends upon the relative elasticity of the demand in that market place.
[2] Each unit of the Plant Daniel facility has a 500 megawatt capacity. Hence PSC contends that if MPC had merely not built unit 2 they could have avoided the $38,000,000 in cost overruns attributable to their 1/2 interest and would still have 500 megawatt generating capacity which they presently have from Plant Daniel. What both the PSC and the majority fail to grasp is that the "adjustment" has nothing to do with generating capacity, but has only to do with calculation of, and payment for each company's one-half interest in a generating plant which increased the capacity of both companies.