McRAE, Justice,
for the Court:
This is an appeal from a December, 1987, ruling of the Public Service Commission (hereinafter PSC or Commission), wherein the PSC unanimously overruled its 1986 decision by ordering a reduction of the water and sewer rates of Rankin Utility Company, Inc., (hereinafter Rankin Utility or Utility). Appeal was then taken to the Chancery Court of Rankin County, which affirmed the PSC’s order. Rankin Utility appeals to this Court citing seven (7) assignments of error. We affirm the decisions of the lower court and the PSC and address only the dispositive issues.
I.
A.
Rankin Utility is one of five subsidiaries of Castlewoods Land Development Corporation [1] (hereinafter Castlewoods) and provides water and sewage services to its parent corporation Castlewoods Subdivision. The Commission held that Rankin Utility had failed to enforce its own tariffs against its corporate affiliates, as required by law, and, as a result, the capital costs of the Utility and its existing customers were greatly increased. Further, Rankin Utility Company had invested capital in water distribution facilities sufficient to serve 701 customers[2] and in production and storage facilities sufficient to serve some 2,400 customers. The Commission found the system installed by Rankin Utility was sized to be a future benefit to the private land developers affiliated with Rankin Utility Company, who have avoided payment of contributions to the construction, lawfully owed by them to the Utility, which would have benefitted the Utility’s ratepayers.
Larry Edwards, president of Rankin Utility Company, testified that when he and Zach Hederman, Jr., acquired Rankin Utility in September, 1983, its water system was under a quasi-moratorium on new connections by the Board of Health due to low water pressure. Although Rankin Utility upgraded an existing well and constructed an additional well, low water pressure remained a problem at Castlewoods.
*707 B.
In 1986, in proceedings U-4828 before the PSC, Rankin Utility asked for an increase in its water and sewer rates. As a result of the proceedings, the Public Service Commission Staff (hereinafter staff) and the Utility entered a stipulation proposing a substantial rate increase which the PSC approved effective October, 1986. To alleviate the low water pressure problem, the Utility began to explore the purchase of an overhead storage facility, but decided to put their plans on hold pending the outcome of the 1986 proceeding. Rankin Utility maintains that it purchased and installed the $360,000 overhead water tank because the Commission ordered it to do so in its 1986 order. The order read in pertinent part as follows:
The Commission finds that the Rankin Utility Company should be required to construct and place into operation the two hundred and fifty thousand (250,000) gallon water tower reflected in the Company’s filing and that the same shall be done prior to the expiration of twelve (12) months from the date of this order for the use and service of customers in the certificated area.
The staff admitted they had made an error during the 1986 proceedings because it failed to notice that Rankin Utility had neither received nor demanded any offsetting contributions from the developer. Additionally, the staff contended that in 1986 it was unaware that the Utility had failed to follow its service extension policy. Rule 12(C) of the Commission’s Service Rules requires each Utility to adopt an appropriate service extension tariff, (also known as a Service Extension Policy) which would govern the conditions upon which a Utility could extend service to newly-developed areas within its certificated area. The staff maintained that pursuant to the Utility’s own tariffs they were required to demand and receive from the developer, contributions in aid of construction. In support of the staff’s position, PSC’s Chief Accountant Leon Browning testified that the developer and Utility failed to follow the service extension policy.
The PSC’s Opinion and Order reflected that when management acquired the Utility in September, 1983, the number of customers and the capital investment and rate base was as follows:
[[Image here]]
Additional findings included the following:
By 1987 the Utility had increased its rate base by 165%, but the number of customers it served had only increased by 38%. The utility had also “bought and paid for” facilities to serve another 105 lots that were developed but unsold by the developer. The utility had created production and storage facilities that were adequate to meet the needs of over two thousand four hundred (2,400) customers. The evidence indicated that the private developer in this area intended to eventually develop between two thousand (2,000) and twenty four hundred (2,400) lots. Based upon past growth rates it is obvious that it would be many years before the area was fully developed yet the utility had, with one exception, never demanded nor received a single dime of contribution in aid of construction.
On cross-examination, Browning stated that he did not believe that the complete expense of the water tank should be included in the current rate base because its capacity exceeded that which was needed at the present time. He determined this after reviewing the rules and regulations of the Board of Health, talking to the Board of Health engineers, talking to the PSC’s engineer, and reviewing the service extension policy. His view of the service extension policy was that as the system is extended in the future, the new lot owners, or someone, should pay by way of contribution not only for the pipe in the system that *708 is extended, but also for part of the water system.
Edwards did not agree with Browning’s interpretation of the service extension policy. He testified:
My interpretation of that service extension policy would deal with isolated cases where the cost of providing service was uneconomically beneficial to the utility company. If perchance you had someone within our certificated area whose request for service was several miles from our existing services, that would be the time that that policy would be implemented. I do not interpret it to say that the utility company cannot, under its own management decisions, decide to increase the system utilizing its own funds for the potential profits to be made from the additional customers utilizing the system. That is our interpretation. That is what we have operated under since we acquired the system, and I think, as Mr. Browning has pointed out in his testimony, it appears to be that that was used by prior management.
He stated that there was only one situation where Rankin Utility charged contribution in aid of construction: the elementary school at Northwest Rankin Attendance Center. Rankin Utility argued that in 1986 Rankin Utility showed the Commission information which established that the utility company was absorbing extension costs and not charging contributions in aid of construction.
Public witnesses testified that after the 1986 rates took effect, it was not unusual to have $100 sewage and water bills, whereas, prior to the 1986 order, the residents of Castlewoods paid anywhere from $6.50 to $7.50 for their sewage and water.
II.
In August, 1987, the PSC opened a case styled An Inquiry into the Appropriateness of Rates and Charges of Rankin Utility Company in the Rendering of Water and Sewer Service in Rankin County, Mississippi Styled U-5042. In its Opinion and Order of December 23, 1987, the PSC unanimously overturned its 1986 decision by ordering a reduction in rates as follows:
Having found that the company’s rate base is improperly overstated by virtue of its failure to adhere to its own service extension policy, the Commission is required to decide the type and amount of rate base adjustment that should be ordered. The company protests that the Staff’s adjustments, if followed, will prevent them from ever recovering a portion of their investment since they claim that the opportunity to collect a contribution in aid of construction from the developer for lots sold to date is gone forever. This argument strikes us as somewhat disingenuous in light of the fact that the developer is not some unrelated third party but is rather the utility’s corporate alter ego. However, in an attempt to insure that no unfairness results the Commission will order an adjustment to rate base that is slightly different than that recommended by the Staff in its direct testimony. Instead, the Commission will adopt the recommendation of Witness B. Leon Browning in his rebuttal testimony. This proposal allows the company to recover through rate base the cost of production and storage investment necessary to serve all present customers plus all developed but unsold lots. The balance of the investment can and should be recovered from the developer who still has the opportunity to expense those costs into the sale of future lots. The specific calculations necessary to do this are to be found in the testimony of Staff Witness B. Leon Browning in his rebuttal testimony which we hereby specifically accept and adopt.
On appeal to Rankin County Chancery Court, the Chancellor affirmed the 1987 order and in the findings of fact and conclusions of law, stated as follows:
The Commission’s 1987 order was not based on any change of fact or circumstance from the 1986 proceedings, but rather on the discovery by the Commission of additional information. The Commission was unaware in its 1986 investigation that Rankin was not following its own service extension policy and that no *709 offsetting CIAC were recorded in the rate base which later resulted in unjust and unreasonable rates on the public. The 1987 proceedings were an attempt to correct Rankin’s failure to follow its own service extension policy by not charging and collecting CIAC from its affiliated development company. It is, after all, the utility that bears the ultimate responsibility to enforce its own service extension policy. Therefore, based on these facts, the Court finds that the Commission order is not based upon any change in fact or circumstance and is not arbitrary, capricious, or unreasonable.
III.
In Mississippi Public Service Comm’n v. Mississippi Power Co., 429 So.2d 883 (Miss.1983) (Broom, P.J., and Lee D., J.) this Court reiterated the following legal principles regarding the PSC’s authority in establishing rates:
1. The burden of proof rests on the public utility to establish the reasonableness of new rates.
2. The commission, with its expertise, is the trier of facts and within this province it has the right to determine the weight of the evidence, the reliability of estimates and the credibility of witnesses.
3. The order of the commission is presumptively valid.
4. The reasonableness of rates charged, or to be charged, by a public utility is not determined by definite rule or legal formula, but is a fact question requiring the exercise of sound discretion and independent judgment in each case.
5a. The chancery court’s authority on review is limited by Mississippi Code Annotated section 77-3-67(4) (1972) to: The order shall not be set aside in whole or part except for errors of law, unless the court finds it is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of statutory authority or violates constitutional rights.
5b. The authority of 5a has been construed at times as follows: The sole question presented for decision is whether or not the action of the commission was arbitrary, not supported by substantial evidence, or was manifestly against the evidence.
Mississippi Power Co., 429 So.2d at 887 (citations omitted).
IV.
Rankin Utility argues that the application of res judicata and equitable estop-pel results in the conclusion that the PSC’s actions are arbitrary, capricious and unreasonable. Rankin Utility requests that this Court follow its reasoning in City of Jackson v. Holliday, 246 Miss. 412, 149 So.2d 525 (1963) which involved an application of res judicata to a municipal zoning ordinance. Holliday, 246 Miss. at 416, 149 So.2d at 526. Holliday concerned two tracts of land in the City: the Hollidays’ corner lot and Mynelle Hayward’s adjacent tract. Id. The Hinds County Board of Supervisors classified the Holliday lot as commercial and the Hayward lot as residential. Id. at 416-17, 149 So.2d at 526. In January, 1961, Mrs. Hayward and others petitioned the City Council and requested the Holliday land be changed from commercial to residential. Id. at 417, 149 So.2d at 526. The City Council rezoned the land residential in February, 1961, but on appeal the circuit court reversed. Id. at 417-18, 149 So.2d at 526-27. Subsequently, the City Council rezoned the Holliday lot as residential which the circuit court again reversed based on res judicata. Id. at 418-19, 149 So.2d at 527. On appeal, this Court affirmed and stated as follows:
The common law doctrine of res judi-cata, including the subsidiary one of collateral estoppel, is designed to prevent relitigation by the same parties of the same claims or issues. The reasons behind the doctrine, as developed in the courts, are fully applicable to some administrative proceedings, partially applicable to some, and not at all applicable to others. The doctrine is best applied to an adjudication of past facts.
*710 Id. at 419, 149 So.2d at 527 (emphasis added); see also Love v. City of Jackson, 248 So.2d 638 (Miss.1971).
Recently, this Court addressed res judi-cata and administrative proceedings in Hood v. Mississippi Department of Wildlife Conservation, 571 So.2d 263 (Miss.1990) (Robertson, J.) wherein the Department of Wildlife Conservation (DWC) discharged Hood subsequent to his conviction of conspiracy to commit vote fraud. Hood, 571 So.2d at 265. The Mississippi Employee Appeals Board (EAB) affirmed Hood’s discharge and he chose not to appeal. Id. Meanwhile, this Court reversed the criminal proceedings and ordered the indictment quashed. Id. Through a plea bargain, Hood pled nolo contendré and received a suspended sentence. Id. at 265-66. Thereafter, Hood requested reinstatement by the DWC and as a result of its denial, Hood filed suit in chancery court. Id. at 266. DWC filed a motion to dismiss for lack of jurisdiction which the court granted, and on appeal this Court affirmed and stated as follows:
Because every claim Hood asserts was available to him before the Employee Appeals Board — and before the Circuit Court thereafter, had he chosen that route, we hold Hood’s remedy at law plain, speedy, adequate and complete. Because that remedy has been exhausted, Hood’s claim is barred under the elementary notions of res judicata.
Id. at 268; see also Mississippi Employment Sec. Comm’n v. Philadelphia Mun. Separate School Dist., 437 So.2d 388, 396 (Miss.1983) (Robertson, J.) (collateral estop-pel applicable to administrative proceedings).
Hood and Philadelphia Municipal Separate School District are both limited by Holliday wherein this Court stated “[res judicata is] fully applicable to some administrative proceedings, partially applicable to some, and not at all applicable to others. ” Pursuant to Miss.Code Ann. § 77-3-61 (1972):
The commission may at any time, after notice, and after opportunity to be heard as provided in section 77-3~]7, rescind or amend any order or decision made by it. Any order recinding or amending a prior order or decision shall, when served upon the utility affected and after notice thereof is given to the other parties to the proceedings, have the same effect as original orders or decisions. However, no such order shall affect the legality or validity of any acts done by said utility before service upon it of the notice of such change.
Id. (emphasis added).
Because under Miss.Code Ann. § 77-3-61 (1972) the PSC has continuing jurisdiction over utility rates, res judicata is inapplicable to the case at bar.
V.
Rankin Utility argues that there have been no changes in fact since the issuance of the October, 1986 order, and, therefore the December 1987 order is arbitrary, . capricious, unreasonable, and not supported by substantial evidence.
Although the Chancellor determined that the PSC did not base its 1987 order upon any changed findings of fact, we find to the contrary. Rankin Utility’s failure to follow its service extension policy amounted to a major change in fact.
This assignment of error fails under Miss.Code Ann. § 77-3-61 (1972) and the legal principles set out in Mississippi Power Co. More specifically, because (1) the PSC may at any time amend or rescind an order; (2) it is within the purview of the PSC to determine the weight of the evidence and the credibility of witnesses; and (3) Rankin Utility’s failure to follow its service extension policy amounted to a major change in fact, the order in the instant case is valid.
VI.
Rankin Utility next argues that the PSC’s order excluding from its rate base a portion of the overhead water tank investment is unreasonable and constitutes confiscation of its property. The PSC’s December 1987 opinion and order stated:
Staff’s proposal would allow 35.2% of the tower rate base. Additionally, Staff is *711 proposing that the 35.2% figure be applied not to the original Two Hundred Fifty Thousand Dollar ($250,000) estimate proposed by the company in 1986, but rather to the current estimated cost of Three Hundred Sixty One Thousand Dollars ($361,000). According to Staff, the balance of the water tower cost should be collected from the developer for whose benefit the tower was constructed.
Rankin Utility cites Mississippi Public Service Comm’n v. Mississippi Power Co., 429 So.2d 883 (Miss.1983) (Broom, P.J. and Lee D., J.) as analogous to the case at bar. In 1970 the PSC issued a certificate approving the building of Plant Daniel I in Jackson County and subsequently approved plans for the building of Plant Daniel II. Mississippi Power Co., 429 So.2d at 911. Mississippi Power Company postponed the completion of Daniel I in 1974 due to financial difficulties. Id. When construction resumed, Mississippi Power Company announced negotiations between Gulf Power and itself that upon completion of both plants each company would own lk undivided interest in the entire Plant Daniel facility. Id. The PSC approved this agreement. Id. Upon completion and an adjusting of the accounts, the parties determined that they needed a $40,000,000 payment in order to reflect the undivided V2 ownership. The PSC determined that:
[O]f this approximately $40,000,000 which MPC had included in the rate base, $19,000,000 associated with Plant Daniel adjustment payments to Gulf Power Company, and over $1,000,000 associated with coal car payments to Gulf Power Company, were not to be included in MPC’s rate base because the transaction between MPC and Gulf Power had resulted in no additional electric generating capacity for the benefit of MPC’s customers.
Id. at 886.
On appeal this Court reversed the Chancery Court and reinstated the PSC’s order. Id. at 892. In his dissent, Presiding Justice Broom stated as follows:
Today’s decision in disallowing the inclusion in the rate base of amounts resulting from a transaction which was specifically authorized by the PSC conflicts with very appropriate language which may possibly have been overlooked: “[N]or shall any state deprive any person of life, liberty or property without due process of law.”
Id. at 917 (citations omitted).
Rankin Utility argues that both the majority and dissent in Mississippi Power recognized that once having ordered a utility to take certain action, the PSC must allow the cost of that act to be included within the utility’s rate base. We agree that Mississippi Power is analogous to the case sub judice, but only in that the PSC determined that public policy required an equitable compromise between the parties.
Rankin Utility’s alleged hardship must give way to public policy. This assignment of error fails because public policy requires an equitable compromise between the parties, which the PSC reached in its order as explained by appellee:
First, the Commission’s December 1987 order allows a portion of the water tower expenditure to be placed in rate base and thereby recovered through rates from the utility’s existing customers. This is done in recognition of the fact that although the water tower was built largely for the rendering of services to new, undeveloped areas, that there is some benefit derived from the water tower by the utility’s existing customers.
Second, the percentage of the water tower cost allowed in rate base is to be calculated by reference to the ultimate actual cost of $360,080 [sic] rather than to the utility’s original estimate of $250,-000.
Third, the Commission’s order does not prohibit the utility from recovering the remainder of its water tower investment. It merely prohibits the recovering of this portion of its investment from its existing ratepayers. The company can and should recover the balance of its cost from the private developer for whose benefit the expenditure was largely *712 made. Disallowing a portion of the water tower cost from rate base is thus simply a means by which the Commission can insist that the utility follow its own service extension policy and collect CIAC from its affiliates.
VII.
Rankin Utility’s final argument is that the PSC erred in concluding that only 35.2 percent of its facilities are used and useful. This Court described the used and useful test and applied it in State ex rel. Attain v. Mississippi Public Service Comm’n, 435 So.2d 608 (Miss.1983) as follows:
In South Hinds Water Company v. Mississippi Public Service Commission, 422 So.2d 275 at 283 (Miss.1982), we noted that “[a] public utility company is entitled to a fair return only upon the value of such of its property as is useful and being used in service for the customers’ benefit,” and found, “if the property will be employed within a reasonable time, and if the utility’s management can show a definite plan as to how the property will be employed for public service, then the property’s value may be included in the rate base.”
The only evidence presented to justify its inclusion in this case consisted of a schedule of three sites for future generating stations listing only their location and monetary amount and testimony to the ill effects on the investors if this rate base request was denied.
We are of the opinion that because MP & L failed to produce evidence of how and when the property would be employed, as was the case in South Hinds Water Company, the Commission erred in allowing the inclusion of plant held for future use in the rate base.
State ex rel. Attain, 435 So.2d at 620.
Rankin Utility argues that the following evidence taken from Edwards’ prefiled testimony proved that it passed the used and useful test:
In several places in his prefiled testimony, Mr. Browning refers to excess capacity now existing and additional excess capacity which will exist when the elevated storage tank becomes operative, and then concludes that it cannot all be allocated to the present rate base. I understand his position to be that all of the property is not therefore used and useful because it is not currently being used to produce Rankin’s product. I do not understand this to be an accepted practice in utility rate base making. Further, I am advised by my counsel that in the case of South Hinds Water Co. v. Miss. Public Service Commission the Mississippi Supreme Court stated that “if the property will be employed within a reasonable time, and if the utility’s management can show a definite plan as to how the property will be employed for public service, then the property’s value may be included in the rate base.” First, we intend to employ the property in Rankin’s water distribution system as we were ordered to do so by this Commission. Second, it will be put to immediate use for existing customers and continue to be used as the system expands to reach future customers.
[[Image here]]
If excess capacity literally means more than is needed at a given moment to serve customers, I disagree with his conclusion. Some extra capacity is needed, otherwise Rankin would have to add a well or tank each time it added a customer.
Additionally, Rankin Utility contends that it is immaterial who proposed the tank, because the PSC ordered its construction; it is, therefore, used and useful.
PSC argues that the used and useful doctrine and the requirement of having service extension policies are closely related concepts as explained by Browning as follows:
Q: How does the used and useful principle mentioned in your direct testimony relate to the requirement of adequate service extension policies?
A: The regulatory objective involved here is the desire to avoid having an existing ratepayer bear the burden of the *713 capital cost incurred to serve new ratepayers. Another way of saying this is that a given set of ratepayers should only be required to pay for the capital cost associated with the facilities that are used and useful to them (or will, within a short period of time, be used and useful to them). This broad regulatory objective can be accomplished in at least two different ways: (1) The regulator can require the adoption of and adherence to service extension policies. This Commission requires every utility to have a service extension policy, in fact, Rankin Utility has an approved tariff implementing their service extension policy. Under this approach, new customers bring with them and contribute to the utility the capital cost involved in serving that new customer. (2) The alternative way to ensure that existing customers are not burdened with excessive capital investment is to apply the “used and useful principle.” Under this principle, the regulatory [sic] simply examines the total capital investment of the utility and makes a decision whether or not it is all used and useful to present customers. If capital investment is found to have occurred that is for facilities in excess of what is needed to serve the present customer load (plus some reasonable growth) then this excess portion of the investment is excluded from the rate base. Under either approach, ratepayers are protected from supporting excessive capital investment or investment in facilities designed to serve customers that may or may not develop in the future. Q: Has this regulatory objective been met in the case of Rankin Utility’s present customers?
A: No it has not. Existing customers are being required to support the cost of investment made for the purpose of serving future customers. Furthermore, in the absence of some sort of adjustment, existing customers will continue to be forced to support this investment into the indefinite future. Since 1983, the customer growth rate of Rankin Utility has only been about 35%. Rankin presently has 582 customers but already has installed production facilities adequate to serve some 2,400 customers.
Although, in the instant case, it is clear that Edwards’ and Browning’s testimonies were, for the most part, contradictory, Rankin Utility’s last argument fails. Under this Court’s decision in Mississippi Power, the PSC, as the trier of facts, has the power to determine the weight of the evidence, reliability of estimates, and witness credibility. Mississippi Power, 429 So.2d at 887. The PSC’s adoption of Browning’s recommendations and interpretations was well within its authority and supported by substantial evidence.
AFFIRMED.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BANKS, JJ., concur.
ROY NOBLE LEE, C.J., and DAN M. LEE, P.J., not participating.

. MCFC Corporation, the private unregulated developer of the Castlewoods Subdivision; Cas-tlewoods Swim Club, Inc.; Castlewoods Golf Club, Inc.; Windsor Patio Homes, Inc.; and Rankin Utility Company.

. 596 actual customers as of September 30, 1987, and 105 unsold developed lots.